## THE S. O. AND C. COMPANY *vs.* THE ANSONIA WATER COMPANY.

Third Judicial District, Bridgeport, October Term, 1910.

HALL, C. J., PRENTICE, THAYER, RORABACK and WHEELER, Js.

In 1869 *H*, an extensive riparian owner, granted to the defendant, which had been incorporated in 1864 for the purpose of furnishing "an abundant supply of pure water for public and domestic use" to the residents of Ansonia and vicinity, the right "to take, use and appropriate the water of Beaver Brook for the purposes specified" in its charter; but stipulated in the deed that it was not to be construed as authorizing the defendant to build a reservoir farther down stream than its then-existing one. *Held* that as against *H* and his successors in title, this grant did not limit the defendant to such quantity of water as it could gather and divert by means of its then-existing reservoirs and pipes, as contended by the plaintiff, but conferred upon it the right to take all the water of the stream which it could divert and appropriate by means of its then-existing dam and any other or others which it might thereafter construct farther up stream; and that inasmuch as all the rights of the plaintiff were subsequently created by *H*, they were held in subordination to those of the defendant.

One who has lost his original riparian rights through the adverse possession of another, has nothing out of which to carve an easement in favor of a third person which will affect the rights acquired by such adverse user.

Diversion of practically the entire flow of a stream is an act which in its nature must be considered adverse, since it exceeds the use which any riparian owner may rightfully make of the water.

Where one has acquired the right to divert and appropriate all the water of a stream at and above a given point, it is immaterial that the quantity of water actually diverted and used is increasing from year to year, or that additional reservoirs have been built and larger conduits laid.

S. O. & C. Co. *v.* Ansonia Water Co.

In 1886 the defendant built another dam about four hundred feet below the first, and thereby created a small basin called the "filtration reservoir," the water-supply of which came in part from reservoir No. 1 and in part from a small watershed tributary to the stream below that reservoir. *Held* that in view of the contiguity of the two dams and reservoirs, and their relation to each other in use, the detention, in the filtration basin, of water from reservoir No. 1, was in effect a detention of it in the latter reservoir, and thus in accord with the defendant's rights; and that inasmuch as the accumulations of the watershed had been commingled with the rest of the water in the filtration reservoir and had been fully and freely used by the defendant for its purposes, even to the exhaustion of the flow and under a claim of right, for more than fifteen years next before the commencement of the plaintiff's action, the defendant had thereby acquired by prescription a right to continue such user.

The extent of the right to use water, acquired by prescription, is measured by the extent to which the claim was asserted and maintained, that is, by the actual use during the time the right is being acquired.

The defendant also built a turning dam on the watershed which merely changed the course of some portion of the natural flow from the filtration reservoir into No. 1. *Held* that under these circumstances the defendant had not been harmed by the construction and maintenance of that dam.

The question whether such a dam increases the amount of water diverted from the stream, is peculiarly one of fact for the determination of the trial court, whose conclusion is not reviewable on appeal unless it is unsupported by the evidence, or is legally, or logically and necessarily, inconsistent with facts found, or with those which the trial court was bound to find from the evidence.

One who has acquired a prescriptive right to maintain a reservoir and draw therefrom all the water that will flow through a pipe of limited capacity may continue such user without liability therefor.

The plaintiff contended that in recent years there had unquestionably been a diminished flow of water during dry periods below a dam and reservoir constructed in 1883 by the defendant at a point a mile and a half below its No. 1 dam, and that this necessarily proved an increasing diversion of the waters of the stream. *Held* that while this reasoning would possess no little force as addressed to the general question of the extent of the defendant's diversion of the waters of the stream as a whole, it did not necessarily follow that the alleged diminished flow was caused by the defendant's constructions below dam No. 1, since such diminished flow might well be accounted for by the defendant's operations above that dam, whereby the quantity of water diverted at that point had been largely augmented; and therefore that the inquiry must be

directed to the use acquired by prescription at each point of use, independently, and not as to the effect of the defendant's acts upon the flow of the stream as a whole.

The plaintiff also complained that the defendant had detained water until it became discolored and foul, and had then discharged it to the resulting injury of the plaintiff. *Held* that the finding negatived this claim.

In consideration of the grant of the right to maintain one of its dams and reservoirs, the defendant agreed to supply the grantor, a lower riparian owner and manufacturer, with enough water to run his water-wheel during two hundred and twenty working days in each year; and to enable the defendant to perform that obligation and at the same time conserve its water-supply for Ansonia and vicinity, it undertook certain operations in a swamp by means of which its storage facilities were largely increased. *Held* that the agreement to supply water-power was auxiliary to the main purpose for which the defendant was created, and well adapted to accomplish that purpose advantageously, and fell within its corporate powers.

A corporation may exercise all powers, within the fair intent and purpose of its creation, which are reasonably proper to give effect to powers expressly granted; and in doing this, the corporation must have a choice of the means adapted to ends, and is not to be confined to any one mode of operation.

Argued October 26th—decided December 16th, 1910.

SUIT to enjoin the defendant from maintaining its dams and diverting the waters of Beaver Brook and its tributaries, and for damages, brought to and tried by the Superior Court in New Haven County, *Robinson, J.;* facts found and judgment rendered for the defendant, and appeal by the plaintiff. *No error.*

Beaver Brook is a nonnavigable watercourse flowing into the Naugatuck River in Ansonia. The plaintiff owns a tract of land upon the river and near to the mouth of the brook, upon which is situated its factory, operated by it for manufacturing purposes, and requiring the use of considerable quantities of water for its operation. A short distance from this tract is another known as the Burns lot, which it also owns. The brook runs through this lot. In 1837 certain riparian owners

farther up stream made a 999-year lease to A. and A. Smith, their executors, administrators, and assigns, of the privilege of digging and embanking a watercourse and carrying water through the same in such quantities as the lessees should from time to time determine, from a point on the brook covered by the lessor's ownership through their land in a designated course to a small pond, which was then used, or came to be used, by the lessees in operating a factory at that point. The ditch was dug, its course being substantially parallel with the course of the brook, only a short distance therefrom, and approximately two thousand feet in length. This privilege was subsequently used to operate factories at the point stated until about 1873. Since 1877 the use of water in this mill-pond and on this factory lot has been abandoned. This ditch took practically all the water of the brook, except in times of flood, and diverted it to the mill site.

One Hubbell later became the owner of this mill site and privilege, of all the land in any way connected with the privilege, and also of the Burns lot. While he was such owner, he, in 1869, by a conveyance duly recorded, granted to the defendant, its successors and assigns, "the right to have, take, use and appropriate the water of a brook, known as Beaver Brook, for the purposes specified in the charter of The Ansonia Water Company, aforesaid, and to conduct said water through the pipes of said water company from the reservoir of said water company into said borough of Ansonia for use and consumption." To this grant was attached the condition that it should not be construed as authorizing the company to build a reservoir farther south than its present one. At the time of this grant the defendant had already constructed its original dam, known as No. 1, and the reservoir thereby created, and with Hubbell's consent laid its pipes therefrom.

The deed contained a release of all claim for damages arising from the laying of the pipes.

In 1881 Hubbell, being still the owner of said premises and privilege, except as affected by the grant just recited, conveyed by deed to one Schneller, whose rights, thereby acquired, subsequently passed to the plaintiff, "the perpetual right and privilege of taking water from Beaver Brook on the premises of and prior to the grantor and convey the same over said grantor's premises to the premises of the grantee or his heirs, or assigns in a pipe or other conveyance with an outlet at said grantee's premises of not over four inches square." The premises of the grantor thus referred to are those of the old mill site.

In 1883 Hubbell conveyed to Schneller the old mill site, and the land connected therewith. In 1899 Schneller's heirs conveyed that part of the property upon which the factories stood to other parties. In 1904 they conveyed the remainder of the land to the plaintiff, who in 1905 conveyed it away.

In the spring of 1884 the plaintiff, acting under the authority of the grant of water-privilege to Schneller, constructed a head-gate at a point substantially at the intake of the old ditch, and laid a pipe thence to its factory. There was no storage reservoir connected with these pipes. After they were laid the plaintiff used the water passing through them for its general factory purposes. This water supply was gradually discontinued, until at some time not later than 1900 its use was entirely abandoned. During that year a portion of the pipe was carried away by a freshet, and has never been replaced.

In 1904 one Fosdick, the owner of a tract of land upon the brook below the intake of the old ditch, conveyed to the plaintiff a right to construct and maintain a dam across the brook, create a storage reservoir,

and lay and maintain an eight-inch pipe from the dam across the grantor's property. The same year the plaintiff, pursuant to this authority, constructed a dam and reservoir at the point named, and laid pipe to its factory several hundred feet away. Since that time the plaintiff has used this dam, reservoir, and pipe to obtain a water supply for its factory.

The defendant was incorporated in 1864 for the purpose of "supplying the village of Ansonia and vicinity with an abundant supply of pure water for public and domestic use." To effectuate that purpose it has built and maintained across the waters of the brook in question four dams, and thereby created four reservoirs or storage basins. The first of these, already referred to, was constructed in 1868 and 1869. At that time a service outlet, through a twelve-inch pipe, was laid. This outlet, or one of like capacity, has remained to the present time, and until 1904 was the only connection between the reservoir and the distribution system. In 1904 a twenty-four-inch outlet pipe was laid by the side of the existing twelve-inch. This pipe connects with the distribution system a considerable distance away in the direction of the city.

In 1886 the defendant built another dam, the third to be constructed, and known as the Filtration dam, approximately four hundred feet below No. 1, and thereby provided a storage basin of small capacity. This basin and the No. 1 reservoir, operated in close connection, comprise the defendant's high-pressure system. The water which reaches the filtration basin comes in part from No. 1 reservoir and in part from a small watershed which naturally drains into the stream between the two dams. This has always been so. When the filtration dam was built, a twelve-inch pipe leading through a well-house was laid from its reservoir to the twelve-inch pipe from reservoir No. 1. In this

way alone did water from the filtration reservoir reach the distribution system until 1904. At that time, the twenty-four-inch pipe having been laid from reservoir No. 1, the twelve-inch pipe from the filtration reservoir was connected with the twenty-four-inch pipe so that it was connected with both of the outlets from the first-named reservoir. Valves were placed at the connections so that they might be used at pleasure. The connecting pipe, however, which took the water from the filtration reservoir has always remained the original twelve-inch pipe. Prior to 1905 the entire water supply obtained from these two reservoirs was drawn from the filtration reservoir through the twelve-inch pipe leading therefrom, the waters of reservoir No. 1 being fed into the filtration reservoir as required. In 1905, the twenty-four-inch pipe having been installed, the connection therewith made, and the turning dam hereinafter referred to built, this supply has since been drawn directly from the No. 1 reservoir, and the connection with the filtration reservoir has been used on occasions only. For the purpose of conveying this water since the date last mentioned, the twelve-inch pipe has been regularly used. The larger pipe has been used only in case of fire, and then to increase the pressure. Electric connection from the company's office enables the gate or valve to be opened from that point when the increased pressure is desired.

In 1905 the defendant built a dam—not across the flow of the brook—which is known as the turning dam. Its location is in the small watershed, already referred to as naturally tributary to the filtration reservoir. It does not create a storage basin, and its only effect is to divert into No. 1 reservoir the water which it intercepts, which, without it, would reach the filtration reservoir. The amount thus intercepted and diverted is intermittent, and often none at all. The result of

its existence is that water which from 1896 to 1905 found its way into the high-pressure system through the filtration dam has since found its way into the same system through reservoir No. 1, and that thus the same supply of water from the same sources has been continuously used ever since 1886, by the one method or the other. The dam across the brook which was built second in order of time is the so-called Quillinan dam, located some mile and a half lower on the stream than the filtration dam, and constructed in 1883, and rebuilt in 1884. This is the lowest down of all the defendant's constructions, and is more than half a mile above the intake of the old water-privilege of 1837. The reservoir thereby created, and the mains and pipes therewith connected, constitute the defendant's low-pressure system. The service outlet from this reservoir has always been one of eight-inch capacity and there has been no increase in the amount of water diverted over that which immediately followed the building of the dam.

In 1895 the defendant built a dam farther up stream than the No. 1. This is called the Peat Swamp dam, and creates a reservoir of large capacity. Its purpose and use has been to furnish the main source of storage, so that water might be kept at the proper height in the distributing reservoirs. It stored the flood water which came down in rainy seasons, to be utilized in dry seasons. No means of distribution are connected with it except by way of the gate and brook through which the water is carried down to the reservoirs below.

The storage capacity of the several reservoirs is as follows:—

| | |
|---|---|
| No. 1 reservoir . . . | 23,000,000 gallons. |
| Quillinan reservoir . . | 33,000,000 gallons. |
| Filtration reservoir . . | 500,000 gallons. |
| Peat Swamp reservoir . . | 175,000,000 gallons. |

In 1884, after the construction of the Quillinan dam, the Sperry Manufacturing Company, the owner of riparian land below the dam and above the intake of the old ditch, and the operators of a factory situated thereon, the power for which was derived from the waters of the brook, granted to the defendant, by deed duly recorded, all its right and interest in and to those waters above said dam, and the right and privilege to forever maintain the same and to divert the waters of the brook above that point. In consideration of this grant, the defendant agreed to supply water for the wheel of the Sperry factory, in such quantities as one of its then capacity required, during the working hours of two hundred and twenty working days, ten hours a day, of each year, reckoning from July 1st, or in default thereof to pay $5 a day for each day less than that number. For the first twelve years after the execution of this instrument the defendant paid for days in default in all years save four, and the number of days each year for which payments were made ranged from fifteen to seventy-three. In only four of the twenty-four years from 1884 to 1908 has the Sperry plant been supplied for a greater number of days than two hundred and fifty-one. For the first fifteen years the average was two hundred and four days, while for the remaining nine it was two hundred and fifty days.

The situation resulting from this Sperry contract led the defendant to its operations upon and in connection with the so-called Parker Brook. This flow of water enters Beaver Brook below the Quillinan dam and above the Sperry plant. The conclusion of the court as stated in its memorandum of decision, made a part of the finding for that purpose, is that the plaintiff failed to support its allegation that it was a stream of any kind. All that the finding itself discloses is that this so-called brook is simply a ditch dug through a

natural embankment for the purpose of draining a swamp whose natural drainage was in a different direction. The defendant in the spring of 1906 built a dam across this ditch, and thereby created a storage basin covering a swamp. The water thus stored it has held in captivity to be released as might be desired in the furnishing of the Sperry plant the water required by its contract. It was not otherwise used. The facts found as to the manner in which this water was used are sufficiently stated in the opinion.

*Frederick W. Holden* and *John K. Beach,* for the appellant (plaintiff).

*Edward A. Harriman,* with whom was *Harold E. Drew,* for the appellee (defendant).

PRENTICE, J. The plaintiff, by its complaint in two counts, seeks legal relief in the form of damages and equitable relief by way of an injunction, on account of an alleged invasion, and threatened invasion, of its rights to the natural and unpolluted flow of the waters of a nonnavigable watercourse, known as Beaver Brook, and on account of other injuries alleged to have been received and to be threatened through the defendant's conduct, past and proposed, in respect to the waters of an alleged tributary thereto, called Parker Brook. The delict set out in the first count consists of the diversion and appropriation of the waters of Beaver Brook to the defendant's uses in supplying the city of Ansonia with water, and of the detention of the waters of Parker Brook, so-called, and the threat to continue such diversion, appropriation, and detention. That set up in the second count consists of the defendant's accumulation of the waters of Parker Brook in such manner that they became discolored and fouled,

and then sending them down, thus discolored and fouled, with great force upon the plaintiff's factory, works, and water system, to the plaintiff's damage, and the threat to continue such conduct.

An appropriation and diversion of the waters of Beaver Brook by the means and in the manner charged, and an intention to continue in its present course of action, is admitted. The defendant asserts the right, as against this plaintiff, to do what it has done, and is doing, and that the limits of its rights have not been, and will not be, thereby exceeded. The issue presented upon this phase of the case thus becomes resolved into one as to the existence in the defendant of a right such as it asserts, which furnishes a legal justification for its acts, past and proposed, which are made the subject of complaint, or of some portion of those acts.

The diversion and appropriation, accomplished and threatened, referred to, is one accomplished and to be accomplished by means of the construction and maintenance of four dams across the flow of the brook at different places in its course, the ponding of water into reservoirs at these points, the inevitable evaporation of this ponded water, and the diversion through the defendant's pipes of water thus detained to the uses of its customers. The operation of these dams in producing these results has been supplemented by the maintenance of another dam, not across the flow of the brook, but so placed that its effect has been to change the natural course of water in a watershed from one reservoir to another.

Whatever rights the plaintiff may have had to the natural flow of this stream must have been derived from one or more of the following sources: (1) From its ownership of the Burns lot; (2) as a consequence of the conveyance by Hubbell to Schneller, and by Schneller to the plaintiff, of a portion of the land connected with

the mill site in favor of which the lease of 1837 was made; (3) from its succession to the rights acquired by Schneller from Hubbell, through the grant of a water-right made in 1881; and (4) from the Fosdick agreement.

This enumeration of possible sources does not include the plaintiff's ownership of its factory site, since it is found that the original lines of that tract, although abutting on the Naugatuck River, never touched the brook. It is, therefore, nonriparian land in so far as Beaver Brook is concerned.

The plaintiff's title to the Burns lot runs back to Hubbell for its source. All of that portion of the old mill-site property which the plaintiff ever owned was conveyed away by it some years ago; the mill site was abandoned for factory uses, and the use of the water in the pond for power purposes given up as far back as 1877; and the use which the plaintiff desires to make of the water of the brook is not in connection with that site, but in connection with its factory elsewhere located. The consequence of these facts as bearing upon the plaintiff's claims need not be noticed, since whatever rights the plaintiff might under any conditions have to the water-privilege created by the lease of 1837, go back to Hubbell as their source. This is equally true whether it be sought to trace them through the plaintiff's acquisition of a portion of the land connected with the mill site, or through the grant of 1881 to Schneller. Hubbell was at one and the same time the owner of the Burns lot, the water-privilege created by the lease of 1837, and all of the land in favor of which that privilege was granted. In 1869, while he was such owner, and before he had made any of the conveyances under which the plaintiff claims, he made his grant to the defendant. This grant is too clear and comprehensive in its language to justify the con-

struction which the plaintiff asks us to place upon it, to wit: that it was a grant of a right to take and appropriate, limited to the capacity of the defendant's constructions and pipes as they then were. Manifestly it was one by which the defendant became entitled, as against Hubbell and his successors in title, to have, take, use, and appropriate, for its charter purposes, all the water of the brook which it should choose to gather and divert for those purposes at the place of its then existing dam or higher up stream. As the plaintiff's rights just enumerated were all subsequently created by Hubbell, it holds them in subordination to the defendant's rights acquired by its grant from him.

Fosdick appears to have owned land upon the borders of the brook, which Hubbell never owned. The point at which he, by his grant to the plaintiff, permitted a dam to be built, and at which it was built, was below the intake of the ditch which was built in 1837, pursuant to the lease of that year, to carry the water to the mill pond and site which the lease authorized to be so carried. This ditch, except in times of flood, took practically all the water from the stream adjacent to the Fosdick land at and above the point where the dam was built. It thus appears that Fosdick, at the time that he undertook to carve out of his rights as a riparian owner an easement in favor of the plaintiff, had nothing out of which to carve it as affecting the defendant as the grantee of Hubbell. *Waterbury* v. *Platt Bros. & Co.*, 76 Conn. 435, 438, 56 Atl. 856. The rights to the natural flow of the stream which had originally attached to his land, had long since passed by prescription to Hubbell as the owner of the mill site and privilege, and from him to the defendant. Riparian rights may be gained and lost by adverse user, and all the conditions for the accomplishment

of such a result as against the Fosdick land are here present. The user by the owners of the water-privilege had continued for many more than fifteen years before Hubbell, its then owner, made his grant to the defendant in 1869; this user was open and of such a character as to give notice to all concerned of it and of the extent of it; it was under claim of right unmistakably manifested by the circumstances and by the recorded grant; and it was of such a character as to work an injury to the owner of the Fosdick land, justifying an action by him. *Parker* v. *Hotchkiss*, 25 Conn. 321, 330; *Water Commissioners* v. *Perry*, 69 Conn. 461, 468, 37 Atl. 1059; *Williams* v. *Wadsworth*, 51 Conn. 277, 305; 2 Farnham on Waters & Water Rights, § 537. Diversion is an act which in its nature must be considered adverse. It is "of itself notice that it is adverse and in opposition to the rights of other riparian owners," since it is an act in excess of "any use which the riparian owner may rightfully make of the stream." 2 Farnham on Waters & Water Rights, § 540.

It follows that Hubbell, when he made his grant to the defendant in 1869, had gained the right to divert the waters of the brook away from the Fosdick land, or at least that part of it which concerns the present controversy, and that Fosdick had lost the right which had once attached to that land as riparian property. The defendant is, therefore, either by force of the Hubbell grant or otherwise, not open to an action by the plaintiff, as the grantee of Fosdick, for an invasion of those rights as they originally existed, in so far as that invasion is claimed to have resulted from the diversion and appropriation of water at and above dam No. 1, which is the subject-matter of our present discussion.

These considerations lead to the conclusion that as against this plaintiff the defendant has had, during the years covered by this action, and now has, the right

to divert, appropriate, and use the waters of the stream in question at and above its dam No. 1 to the fullest extent, and that the rights of the plaintiff have not been, and are not now being, invaded or threatened by any diversion or appropriation it has been, or is now, making, or can make, at or above said dam. This being the case, it is a matter of unconcern whether or not the diversion and appropriation which has been there made has been one increasing with the years, and is now greater than ever before, or what additional reservoirs may have been there built, or what additional or larger conduits for the conveyance of this water to the points of its ultimate use by consumers may have been installed.

The water which the defendant has appropriated through the medium of the Filtration dam, located immediately below dam No. 1 and the small basin it creates, has been contributed from two sources. A portion of it has come down from the No. 1 reservoir; the balance from a small watershed which naturally sought the stream below dam No. 1. The proportions in which these two sources of supply have contributed do not appear. The water from the first of these sources was that which the defendant primarily, and until released by it as free water of the stream, had the right to keep imprisoned for its use, and, thus imprisoned, to appropriate. Its detention in the filtration reservoir was, in view of the contiguity of the two dams and reservoirs, and their relation to each other in use, in effect a continuation of its imprisonment, and the defendant's rights to it were thereby continued. It could have turned it aside into a basin away from the brook, and there stored it for its uses. By the same right, it could retain its capture by the provision of a basin to hold it along the course of the stream. The provision of such a basin as the one last

named, however, would be quite likely to present a complication arising from the fact that other water would in the course of nature find its way to it. Such is the case here, and we have to consider the effect of that aspect of the situation.

The facts disclose that the defendant from 1886 to 1905 continuously caused the water of the watershed contributory to the filtration reservoir to be commingled with its other water there held in captivity as stated, and the commingled waters to be drawn off through its constant twelve-inch pipe for the service of its patrons as that service might require. Doubtless, at times, quantities of this commingled water, more or less large according to rainfall, escaped into the free waters of the brook, thus carrying with it some water which was supplied by the watershed. That such was not the case in appreciable quantities during considerable portions of each year, and that during such portions of each year the defendant, regardless of all considerations except those growing out of its own needs, used up the water contributed by the watershed to the limit of its power to do so with its existing constructions and pipes, and even to the limit of supply, is apparent from the finding that none of the defendant's dams ran over in the summer season except in case of heavy rains, and that in dry times it used all the water obtainable from its reservoirs. Quite probably the draught through the service pipe, measured as it was by the demand, was not constant in its amount. But its quantity was such, within the limits of the capacity of this service-pipe, as the demand called for. To supply this demand in so far as the defendant's constructions, which have remained unchanged, permitted, the waters from the two sources of supply were commingled, ponded, and drawn off as the defendant chose, without restriction, restraint, or limitation. The water

of the watershed was in this way appropriated and used fully and freely within the limits set by the dam, reservoir, and service outlet, and it was thus used in such a way as to unmistakably and openly indicate the defendant's claim upon the water and its purpose to make it its own in use and enjoyment.

There can be no question of an adverse user to some extent for the length of time required. This is conceded. The only question is as to the extent of this user. The extent of the right acquired is measured by the extent to which the claim was asserted and maintained. 2 Farnham on Waters & Water Rights, § 542. It is limited by the previous enjoyment. *Middlesex Co.* v. *Lowell*, 149 Mass. 509, 21 N. E. 872; *Norway Plains Co.* v. *Bradley*, 52 N. H. 86. It is determined by the actual user while it is being acquired. *Shrewsbury* v. *Brown*, 25 Vt. 197; *Whittier* v. *Cocheco Mfg. Co.*, 9 N. H. 454. Adverse user consists in using as one's own. *Johnson* v. *Gorham*, 38 Conn. 513, 521; *Searles* v. *DeLadson*, 81 Conn. 133, 136, 70 Atl. 589; *Quigg* v. *Zeugin*, 82 Conn. 437, 440, 74 Atl. 753.

Measured by these standards it must, we think, be said that the defendant has so peculiarly and emphatically appropriated to its own use, and so used as its own, and enjoyed, the waters of the watershed tributary to the Filtration reservoir to an extent measured by its constructions and outlet, and that it has so openly and notoriously asserted and maintained its claim thereto to the denial of any right in the plaintiff, that it had many years ago acquired the right to do all that it has done at this point within the period covered by this action, or, so far as appears, it proposes to do there in the future. This result follows from the concession made in the brief of plaintiff's counsel, hereinafter more fully noticed, that where there has been a diversion through a pipe of limited capacity

the right acquired is conveniently and ordinarily measured by the capacity of that pipe.

The turning dam went into operation in 1905, at the time that the change was made whereby the water for the high-pressure service was drawn from reservoir No. 1 instead of from the Filtration reservoir, as theretofore. It accomplished no other result than the turning of some portion of the water of the watershed, which naturally passed into the latter reservoir and previously had done so, into the former, whence it was in due course drawn off into the city supply system. The amount so diverted was small at best, intermittent, and in dry times none at all. The court has found that the only result of the maintenance of this dam has been to change the course taken by the water intercepted by it in its route to consumers, and that there has been no increase in the water thus diverted from the stream. Upon the basis of this finding it is apparent that the plaintiff has not been harmed by the construction and maintenance of this dam.

But the plaintiff appeals from the court's finding in this regard, asserting that it was not warranted in reaching its conclusion. The question presented is peculiarly one of fact, and depends for its answer upon the ascertainment from the evidence of various matters of fact, and upon inferences of fact to be drawn therefrom. The contrary proposition, for which the plaintiff contends, is not an admitted or undisputed fact, and we cannot say that the court's conclusion is without support in evidence, or was legally, or logically, necessarily inconsistent with facts found or which the court was bound to find upon the evidence. *Spencer* v. *Merwin*, 80 Conn. 330, 336, 68 Atl. 370.

Passing down stream to the Quillinan dam, we reach a reservoir of the defendant's low-pressure system, which, from the beginning of its existence in 1883 until

now, has had as its only service outlet a single eight-inch pipe. Concerning the diversion of the water here gathered, the court has found that there has been no increase in its amount over that made immediately after it was built. No complaint is made of this finding of fact, and it stands unchallenged in the reasons of appeal, and in the brief of counsel. On the contrary, we find that counsel in their brief, after advancing the proposition that the general rule for the determination of the extent of water rights acquired by prescription is that it is measured by the adverse user, and is commensurate with the right enjoyed during that user, asserts as its corollary that "where the diversion is through a pipe of limited capacity, as in this case, the right acquired is conveniently and ordinarily measured by the capacity of the pipe; in this case, from the locality of dam No. 1, through a twelve-inch pipe, and from Quillinan dam through an eight-inch pipe." Here is a distinct admission that the defendant has not been diverting more water from the stream at the Quillinan dam than it had acquired a prescriptive right to do, since it has never drawn water away from the stream at that point through any other outlet than the original eight-inch pipe. Thus the same conclusion is reached upon the basis of the plaintiff's proposition as would result from the court's finding.

The basic proposition of the argument for the plaintiff is, that the defendant had no right to divert the waters of the brook except (1) by virtue of the Hubbell grant to take water at dam No. 1, limited to the capacity of the original twelve-inch pipe, and (2) such further right as it may have obtained by prescription. Starting with this premise, counsel have naturally viewed the situation presented by the flow of the brook as a whole, and sought to demonstrate by the facts found and by others, which they say should have been

found, that the residuum of the stream during dry periods, below the Quillinan dam, the farthest down of the defendant's structures, has been much less of recent years than formerly. As addressed to the broad general question of the extent of the defendant's diversion of the waters of the stream as a whole, this reasoning would possess no little force. But our conclusion as to the sweeping character of the defendant's rights by force of the Hubbell grant, at and above dam No. 1, changes most materially the questions presented by conditions below that dam, and takes away the point of the argument of plaintiff's counsel.

The claimed diminished flow below the Quillinan dam might well be accounted for as the result of causes consistent with a non-increase of diversion by means of the defendant's constructions below dam No. 1. The construction of the Peat Swamp dam with its large capacity, the storage and evaporation there and a larger appropriation of water at or above dam No. 1, one or all of them, might readily furnish a sufficient explanation for the conditions indicated. The conclusion at which we have arrived as to the extent of the defendant's rights under the Hubbell grant is one which, for the purpose of ascertaining the extent of prescriptive rights, demands an inquiry, not as to the defendant's user of the stream generally, but as to its user of the waters of the stream which have from one source or another entered it below the original dam. This inquiry, to have satisfactory results, under the circumstances, must be one which is directed to the use at each point of use independently. This inquiry we have made, with the result that it appears that the defendant has not in recent years, and at any such point made, and is not now making or threatening, a diversion of the waters of the stream which is in excess of its rights acquired by adverse use and enjoyment.

A claim is made in the brief, and was apparently presented to the trial court, to the effect that the plaintiff's rights have been invaded by the defendant's conduct in its provision of water for the Sperry factory under the contract of 1884. The conduct thus complained of consists of detention rather than diversion. Diversion there was not. No water was taken from the stream. If it be assumed that the complaint lays a foundation for this claim, it appears to be one without support in fact. The method in which the water was held back and released was begun in 1884 to meet. the provisions of a recorded grant. It continued without interruption, except as the periods of storage and supply changed from time to time with changed water conditions, until the date of the complaint. Each year has seen many days when water was not released. That condition has regularly marked periods of short water. For the first fifteen years the water was withheld for substantially two thirds of the time on the average, Sundays and holidays not included. These were, of course, the days when the effect upon the stream of the withholding would be the most serious and perceptible. During the more recent years the days when the water has been sent down have represented a larger proportion of the year. Under these conditions it is clearly too late for the plaintiff to urge that this long-continued conduct of the defendant in the use of the stream, persisted in openly and under a claim of right, must cease.

It remains to consider the plaintiff's claims, of minor importance, growing out of the defendant's use of the waters of Parker Brook. In so far as any claim for a detention of those waters is concerned, it was incumbent upon the plaintiff to establish that the water in this so-called brook constituted a watercourse within the meaning of the law. This it failed to do. All that

is found is that it was simply a ditch dug through a natural embankment for the purpose of draining a swamp which naturally drained in a different direction. There is no exception to this finding. A watercourse may of course have a natural or an artificial origin; but, whatever its origin, it must meet certain recognized conditions. *Chamberlain* v. *Hemingway*, 63 Conn. 1, 5, 27 Atl. 239. The finding does not sufficiently disclose the existence of these conditions in the present case.

We do not understand, however, that plaintiff's counsel urge any claim arising from the detention alone. Their reliance rather is upon the claim that it was injured by the defendant's wrongful and harmful manipulation of the flow of the water which passed through this ditch, in that it, by means of a dam, detained and stored the water under conditions which discolored and fouled it, and then, by opening the sluiceway, let it down, thus discolored and fouled, in large quantities and with violence to mingle with, discolor, and befoul the waters of Beaver Brook, and that by the course of the latter brook the discolored and fouled resultant came down upon the plaintiff's works and water system connected therewith. With respect to this claim the finding is that the defendant's use of this water was a reasonable one; that it was let down in reasonable quantities and in a reasonable manner; that only upon one occasion was foul or discolored water let down; that this water was not otherwise objectionable than that it was discolored; that this was let down without fault on the part of the defendant; and that the plaintiff suffered no injury therefrom. This finding is unattacked, and disposes of any claim of injury, or threatened injury.

The plaintiff urges that the defendant's operations upon Parker Brook were in excess of its corporate

powers, and that this fact entitles the plaintiff to have injunctive relief. The claim also appears to be made that the defendant could not acquire by prescription a right in and to the waters of Beaver Brook or to the control and management of the same, through any conduct relating to the service of the Sperry plant, for the like reason that it had no right to perform that service, since it was not one which had for its object the supplying of water for public or domestic use and its charter powers are limited to the provision of such use.

It is at least doubtful if the complaint lays a foundation for either of these claims. If it does, a sufficient answer, ignoring all others, is that in neither case is that which the defendant has been attempting to do *ultra vires*. The Sperry service is required under a contract as the consideration for the acquisition of the right to maintain the Quillinan dam and reservoir. The obligation to render this service, thus incurred, lies back of the Parker Brook enterprise, and it was entered upon and carried on for a purpose which it was well calculated to accomplish, of conserving its water supply for the city and its vicinity. It was by no means an independent undertaking unrelated to the purposes for which the defendant was chartered, but was one which was distinctly collateral and auxiliary to its main purpose, and adapted to accomplish that purpose the more advantageously.

Corporations "may exercise all the powers within the fair intent and purpose of their creation, which are reasonably proper to give effect to powers expressly granted. In doing this, they must have a choice of means adapted to ends, and are not to be confined to any one mode of operation." *Bridgeport* v. *Housatonic R. Co.*, 15 Conn. 475, 502. "A transaction may *prima facie* appear to be wholly foreign to the business

for which a corporation was formed; and yet, if it be auxiliary to any legitimate purpose of the company, and adapted to attain the same more advantageously, it is impliedly authorized." 1 Morawetz on Private Corporations (2d Ed.) § 364.

The plaintiff has excepted to a number of statements of fact in the finding not already referred to, and asks corrections. None of these statements, except one or two of minor importance embodying conclusions which the evidence clearly justified the court in reaching, enter into our consideration of the case. There is no need, therefore, of giving attention to them.

There is no error.

In this opinion the other judges concurred, except WHEELER, J., who dissented.