[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
In this case, public interests in the natural condition of a beautiful and nearly pristine river are in competition with public interests in using that river to produce an abundant and low cost supply of potable water. The river at issue is the Shepaug River, which has its watershed in the towns of Cornwall, Goshen, Warren and Litchfield and which flows through the towns of Washington and Roxbury. In 1933, the City of Waterbury ("City") completed a dam across the west branch of the Shepaug to create a storage reservoir to supply additional water to customers of its water bureau by way of a' tunnel that connects the stored water from the Shepaug to the Waterbury reservoir system. Diversion of water from the Shepaug was a measure meant to supplement the City's supply from its reservoirs in the basin of the Wigwam and Branch Brooks. Unlike many other municipalities, Waterbury operates its own water supply through a CT Page 2095 City department known as the Bureau of Water.
Except for the dam and reservoirs at the head of its west branch, the Shepaug River is unusually free from the effects of human habitation and development. No highways run along it, and much of the land along its banks is owned by land trusts or public entities or, though privately owned, is wooded and protected by local zoning from development close to its banks. The river is accessible, however, from several public roads, and it is used for hiking, fishing, swimming, seasonal kayaking and canoeing, and scenic enjoyment, especially in the areas owned and reserved for public use by the Steep Rock Association and the Roxbury Land Trust. Use is not restricted to local residents; the court heard eloquent testimony concerning enjoyment derived from the unspoiled beauty of the river from a truck driver from Wolcott who canoes on the river. The roster of users compiled by the Steep Rock Association, Inc. reveals recreational use by people from many parts of Connecticut and other states, including Boy Scout and Girl Scout camping groups. The river flows through the town of Washington Depot and is a source of water for extinguishing fires in that town and on property along its banks.
For several years residents of the towns along the river and members of the Steep Rock, Association, Inc., the Roxbury Land Trust Inc. and the Shepaug River Association, Inc. have suspected that the diversion of water by the City was causing the river to have extremely low flows in summer months, diminishing its natural beauty, reducing it as a habitat for fish and river organisms, and limiting its value for fishing and other recreation. They brought their concerns to the attention of the Connecticut Department of Environmental Protection, which regulates various aspects of natural resources, and to the Department of Public Health, which has jurisdiction over many issues concerning public water supplies. The State established a task force to study the issues concerning the Shepaug River, but the work of the task force did not lead to a resolution of the conflict between the municipalities. Waterbury and three towns (Wolcott, Middlebury and Watertown) that obtain, or seek to obtain, water from the Waterbury Water Bureau, perceived the rising criticism as a threat, and both sides to the controversy filed suit in late July 1997, each seeking injunctive and declaratory relief.
The two cases were transferred to the Complex Litigation Docket for management and trial. Upon the suggestion of the court that CT Page 2096 the issues raised in the two suits be merged into a single case, Waterbury insisted on being designated the plaintiff. It filed a complaint seeking a declaration that it had not violated a contract entered into with the Town of Washington in 1921, that its use of the river was lawful, and that it is not impairing the public trust in a natural resource in violation of Conn. Gen. Stat. § 22a-16 of the Connecticut Environmental Protection Act ("the CEPA"), Conn. Gen. Stat. §§ 22a-14, et seq., by the manner in which it operates the Waterbury Water Bureau and by its diversions from the Shepaug River. The Towns of Washington and Roxbury, the Shepaug River Association, Inc., and the Steep Rock Association, Inc. and Roxbury Land Trust, Inc., which own land held in trust along the river ("counterclaimants" or "defendants"), agreed to be denominated defendants, and they pleaded as counterclaims the claims they had asserted in their own complaint, likewise seeking only injunctive and declaratory relief, not monetary damages. Although claims for compensatory and punitive damages were included in the counterclaimants' prayer for relief, these remedies were not pursued at trial. The Towns of Wolcott, Watertown and Middlebury, which either currently obtain all or part of their water supply from the Waterbury Water Bureau or have filed applications seeking to do so in the future, intervened as plaintiffs.
The state's Commissioners of Public Health and of Environmental Protection intervened. By consent, they were not denominated either plaintiffs or defendants, but asserted their own interests in a resolution that fulfilled their respective missions of securing safe public water supplies and protecting the environment.
The Connecticut Fund for the Environment ("CFE") intervened as a defendant and asserted a number of counterclaims against the City.
Because the parties were eager for prompt resolution of their disputed claims, the case was originally scheduled for trial in May 1999. Partly to explore settlement and partly to engage in studies for presentation at trial, the parties sought a continuance of the trial date to December 1999. Because CFE did not succeed in closing the pleadings as to its claims in time for trial, those claims have been severed. The parties agreed that CFE, which was a defendant as to the City's claims, could participate in the trial, and it did to the extent it chose to do so. CT Page 2097
I. The Claims Made
The City of Waterbury alleges that its diversion of water from the Shepaug River and its release of water from the dam into that river comply with the terms of its 1921 contract with the Town of Washington. The City further claims that its actions do not constitute a nuisance, a violation of riparian rights of the defendants, or a violation of the CEPA, specifically, Conn. Gen. Stat. § 22a-16, which provides for injunctive and declaratory relief "for the protection of the public trust in the air, water and other natural resources of the state from unreasonable pollution, impairment or destruction . . ."
The Town of Washington alleges that the City has breached certain provisions of the 1921 contract, specifically, that it has diverted excessive amounts of water from the Shepaug River and has diverted water even when its distributing reservoirs were full and overflowing, in contravention of the terms of the contract.
Washington, the Town of Roxbury (which lies downstream from Washington), the Steep Rock Association, Inc. and the Roxbury Land Trust, Inc., which own land along the Shepaug River, and an association of river users known as the Shepaug River Association, Inc. also claim a violation of the CEPA, specifically, that the City is violating the public trust in the Shepaug River as a natural resource by excessively diverting water from it (Amended Counterclaim, paragraphs 29, 45) and the extent to which it limits the flow of the river in the summer months.[1] These parties also allege that the diversions constitute a public nuisance, a private nuisance, and interference with the rights of riparian owners.
The City raised as special defenses against all defendants the claims that:
there is no feasible and prudent alternative to its conduct, and its conduct is consistent with the reasonable requirements of the public health, safety and welfare;
its diversion was authorized by Special Act 252 (1893);
its supplying of water to various towns and other entities was authorized by Special Act 391 (1921); CT Page 2098
its diversion of water from the Shepaug is exempt from review under the standards of the CEPA;
it has a prescriptive right to divert water from the Shepaug;
laches;
lack of jurisdiction of this court to decide the counterclaims; and
limitation of a remedy to the remedies and procedures set forth in Special Act 252 (1893).
The City asserts the following additional special defenses solely against the defendant Town of Washington:
estoppel arising from the terms of the May 3, 1921 agreement and from Waterbury's detrimental reliance thereon; and
waiver of claims arising from conduct authorized by that contract.
The Town of Wolcott alleges in its intervening complaint that Waterbury provides it with water to meet the needs of residents in an area of the town where wells had been found to be contaminated, that this arrangement was authorized by the State of Connecticut in 1986, and that Waterbury has entered into a contract to supply Wolcott with a stated quantity of potable water. The Town of Wolcott alleges in its pleadings that:
Wolcott's receipt of water was further authorized by Special Act 391 (1921);
Limitations in the 1921 agreement between Waterbury and Washington are void to the extent that they limit Wolcott's water supply from Waterbury;
the CEPA is unconstitutional if it restricts or impedes Wolcott from obtaining a water supply from Waterbury;
Waterbury's conduct does not constitute a nuisance; and
Waterbury's conduct does not violate the defendants' riparian rights.
The Town of Middlebury pleads that it is contiguous to Waterbury and its water supply mains, and has entered into a CT Page 2099 contract to obtain water from Waterbury's water supply. It reiterates the claims made by the City in its complaint. The Town of Middlebury seeks a declaration that "the City of Waterbury is not precluded from supplying potable water to the Town of Middlebury from sources other than the Shepaug River" and that "there is a public necessity for Middlebury to have access to Waterbury's water supply system."
In its intervening complaint, the Town of Watertown asserts not only some of the claims made in Waterbury's complaint, but also that it has a valid contract with Waterbury for public water.
The Towns of Washington and Roxbury and their co-counterclaimants assert special defenses against Watertown and Middlebury; however, they stated in oral argument that they do not seek any remedy that would disturb any existing contracts for the City's provision of water to surrounding towns. The Towns' claims are therefore moot.
The Commission of Public Health takes the position that the outcome of the dispute is one that should recognize the need for a sufficient water supply for the City and towns that derive water in whole or in part from the Shepaug River. The Commissioner of Environmental Protection has similarly urged that if the Court finds that injunctive relief is warranted to remedy an unreasonable impairment of the public trust in a natural resource, the terms of the relief ordered should be consistent with the public water supply needs of Waterbury and the region.
II. The Trial
Much of the evidence in this non-jury case was technical and specialized in nature. For that reason and at the urging of the court, the parties agreed to depart from the usual trial procedure of presentation of all of the plaintiff's witnesses followed by all of the defendants' witnesses. Instead, to the extent possible, one party's expert on a technical subject was followed immediately by the other parties' experts on the same subject. This procedure facilitated the immediacy of comment by the experts on each other's methods and conclusions and enabled the parties to have their own experts present as advisors during the presentation of the other experts. Because some expert witnesses testified on more than one subject, such witnesses were recalled with regard to each subject.
The presentation of evidence and oral argument took place over CT Page 2100 a period of six weeks.
III. Standard of Proof
With regard to all claims, counterclaims and defenses other than Waterbury's claim of prescriptive rights, the standard of proof is proof by a fair preponderance of the evidence, and that is the standard applied by the court to all factual disputes except those necessary to decision of the claim of acquisition of rights by prescription. As to those claims, the court has applied the standard of proof by clear and positive proof, sometimes referred to as clear and convincing proof. See Roche v.Fairfield, 186 Conn. 490, 498 (1982); Matto v. Dan Beard. Inc.,15 Conn. App. 458, 475, cert. denied, 209 Conn. 812. (1988).
IV. Burden of Proof
The Connecticut Supreme Court has ruled in ManchesterEnvironmental Coalition v. Stockton, 184 Conn. 51, 58 (1981), that a particular method for discharging the burden of proof applies to claims of violation of Conn. Gen. Stat. § 22a-16. The party asserting a claim under this provision "must first come forward and show that the defendant has, or is reasonably likely to unreasonably pollute, impair or destroy a natural resource."Manchester Environmental Coalition v. Stockton, supra,184 Conn. 58. Once a prima facie showing has been made, the burden of production shifts to the defendant against which the claim is made. Pursuant to the provisions of Conn. Gen. Stat. § 22a-17, "the defendant may rebut the prima facie showing by the submission of evidence to the contrary." Manchester EnvironmentalCoalition v. Stockton, supra, 184 Conn. 60-61. "The defendant may also prove, by way of an affirmative defense, that, considering all relevant surrounding circumstances and factors, there is no feasible and prudent alternative to the defendant's conduct and that such conduct is consistent with reasonable requirements of the public health, safety and welfare." Id., Conn. Gen. Stat. § 22a-17.
This court has applied the required analysis in the discussion below of the claim of violation of this statute. Waterbury asserted the absence of feasible and prudent alternatives as a special defense.
As to the other claims and counterclaims and defenses, the party that asserts each has been charged with the burden of CT Page 2101 proof. Conn. Gen. Stat. § 22a-17 specifically provides that "[e]xcept as to the aforesaid affirmative defense, nothing in this section shall be construed to affect the principles of burden of proof and weight of the evidence generally applicable in civil actions."
V. Findings
After considering the factual presentations of the parties, and assessing the credibility of witnesses as well as the significance of documents, and after resolving disputes as to the facts, the court finds the facts to be as follows concerning the conditions at issue and the conduct of the parties.
The City of Waterbury first developed in the low-lying portions of its present location and expanded up the sides of the surrounding hills. The growth of the City in the last part of the nineteenth century and the first decades of the twentieth was related to the development of mills and manufacturing. In 1893, the General Assembly authorized Waterbury to increase its water supply by taking water from "any and all brooks, rivers, ponds, lakes, and reservoirs within the limits of the County of New Haven or the County of Litchfield such supply of water as the necessities or convenience of the inhabitants of said City may require." Special Acts No. 252 (1893). Later enactments excepted Bantam Lake and certain waters of the Naugatuck River. Special Acts Nos. 344 (1909) and 346 (1919).
Rapid growth in population and some dry years in the first decade of the twentieth century strained the City's public water supply. The supply was insufficient at times to maintain pressure to the homes and buildings on the higher elevations, served by the "high service" line. The Wigwam Reservoir, built in 1893, was supplemented by the Morris Reservoir, which was under construction from 1910-1913. By 1917, water for both the high service line and the low service line, which serves the downtown area, came directly from these two reservoirs. The Morris and Wigwam reservoirs collect and store water from an eighteen-square-mile watershed basin known as the Branch Brook basin, through which the Wigwam Brook also runs. (This basin has been variously described during the trial as the "Wigwam basin" or the "Branch Brook basin" to distinguish it from the "Shepaug basin" in the territory from which Waterbury's water supply is derived.)
The higher in elevation of these two reservoirs is the Morris CT Page 2102 Reservoir. When the Morris Reservoir is full, at an elevation of 515 feet, the water from that reservoir spills out and flows down to the Wigwam Reservoir, which reaches its overflow point at 424.8 feet of elevation. When the Wigwam Reservoir is full, it spills into the Branch Brook, which eventually empties into the Naugatuck River.
In 1917, the City's engineers reported the need for additional water. The City obtained land in the valley of the Shepaug River and built a seven-and-one-half-mile long tunnel to deliver water diverted from that river to its water system in the Wigwam basin.
The Town of Washington was wary of the City's acquisition of water from the Shepaug River and introduced legislation in the General Assembly to repeal the 1893 Act. It withdrew the bill upon executing a contract with the City on May 3, 1921. By the terms of that contract, (Ex 501) the City pledged not to reduce the stream flow in the Shepaug River below 1.5 million gallons per day between May 1 and November 1 of each year. The City further agreed that "it will not divert water from the West Branch of the Shepaug River at any time when the distributing reservoirs into which the City aqueduct shall convey such water so diverted are full and overflowing." The 1921 contract provided that the City would divert such water only "to the extent that it may be required to supply the actual needs of the customers of said City and to maintain the storage in its potable water supply reservoir."
The Shepaug Reservoir, located behind the Shepaug Dam that was under construction from 1929 to 1933, is located about eight miles west of the reservoirs in the Wigwam Basin. The watershed basin for the Shepaug reservoir is about twenty-eight square miles in size. In 1943, the City completed the Pitch Reservoir, into which the flow from the Shepaug tunnel was directed. The Morris Reservoir is immediately downstream from the Pitch, which, in addition to water received from the Shepaug basin through the tunnel, stores runoff from part of the Wigwam basin.
In 1963, to increase storage and supply, Waterbury built another dam and reservoir immediately to the north of the Shepaug Reservoir, known as the Cairns Reservoir, with a watershed of approximately ten additional square miles in the Shepaug basin. The Wigwam basin's watershed, at 18 square miles, is roughly half the size of the Shepaug watershed, which occupies a total of 38 square miles. CT Page 2103
The northernmost portion of the Cairns Reservoir is in the marshy lands and small streams which converge to form the source of the Shepaug River. Because of this fact, when the parties sought to arrive at a natural flow rate for the Shepaug River, that is, the volume of water that would have flowed down the river if no dam had been present, they could not do so merely by measuring the flow into the Cairns Reservoir, since the river did not really exist as a single stream at the top of that reservoir, and there were no long-term official records of flow above the Shepaug dam before the Cairns dam was constructed.
There are, at present, three routes by which water leaves the Shepaug Reservoir: by diversion through the aqueduct tunnel to the Pitch Reservoir, by spillage down the spillway to the Shepaug River when the reservoir is full, and by release from a pipe in a chamber in the dam to the Shepaug River. That pipe, which the witnesses referred to as "the eight-inch pipe," if left full open releases a maximum flow of approximately 4.9 million gallons of water per day down the Shepaug River. The flow may be considerably lower depending on the head of pressure.
The Shepaug River has areas along its length which the various expert witnesses characterized as riffles, runs and pools. Riffles are the portion of the stream interrupted by boulders; runs are areas of relatively flat running water over either smoother or deeper stream beds than riffles; and pools are places where water exists in greater depth and with less flow, sometimes because of outcroppings or undercutting of the river bank or because of the proximity to obstructions such as fallen trees. At times of high flow, the water may cover the boulders in the stream bed so that more of the river can be characterized as runs; in low flow, the boulders may protrude from water barely deep enough to wet the feet of a person walking in the stream bed. From bank to bank across, the stream bed varies in width. Full or overflowing at high flows, it can be a narrow, shallow stream running in a narrowed course between exposed boulders at low flows.
There is a pool at the foot of the Shepaug dam. For a substantial distance south of the dam, the land on both sides of the river is owned by Waterbury. Peter's Weir, (a small dam) is located a short distance downstream from the dam, and a stream flow gauge has existed in the past at this weir. About three miles below the weir the west branch of the Shepaug River reaches CT Page 2104 a confluence with the Bantam River, which is located to the east. From the confluence onward, about fifty percent of the summer flow of the Shepaug River is contributed by the Bantam River as measured by Dr. Kenneth Wagner at stream gauges installed in the summer of 1999. The Steep Rock Association, Inc. operates a land trust of about 220 acres located on the Shepaug River both north and south of the confluence with the Bantam River and also in an area on the river north of Washington Depot.
The town center of Washington Depot is south of the confluence. The river flows south from the Depot through about 260 riverside acres owned by the Roxbury Land Trust, along which hiking and other recreational activities are permitted. The parties agree that the stretch of river claimed to be affected by Waterbury's flow diversions is approximately twenty-seven miles in length.
Though many, many facts are in dispute in this case, all the witnesses agreed that the pattern of natural precipitation in the area at issue, a pattern obvious to residents of Connecticut, is that as a general rule the spring months are the wettest because of snow melt and rain, the summer months, from June through September, are dry, and the amount of precipitation increases again in the fall.
The method of operating the City's water system which gave rise to dissatisfaction, and then to the claims of Washington, Roxbury, and their co-counterclaimants in this suit, began soon after Waterbury built a water treatment plant in 1988 to achieve compliance with water quality standards imposed by the federal government. The City located, the treatment plant close to the Morris Reservoir, so that water from the Morris and the Pitch could flow to the plant by gravity, without the need for pumping. Water from the Wigwam would have to be pumped uphill to the treatment plant, incurring energy costs. The City therefore drew its water almost exclusively from the Pitch and the Morris, with the result that the Wigwam Reservoir filled and either spilled over or was lowered by the release of water from a pipe into the Branch Brook, from which water flowed to the Naugatuck River.
Another feature of operation from at least 1988 onward was the use of turbines to pump water to the high service areas of the water supply system. The turbines were powered by the flow from the Pitch Reservoir. A high flow or "head" is required to operate these turbines, and water was diverted from the Shepaug Reservoir through the tunnel in large part to keep the Pitch Reservoir high CT Page 2105 enough to have the requisite head to power the turbines. If the flow from the Pitch was insufficient, the City would have to incur the costs of electrical power to pump to the high service area.
From 1988 onward, the City maintained records indicating the level of the water in the reservoirs and the amount of water sent from the Pitch, the Morris and the Wigwam reservoirs to the water treatment plant. (Ex 514) The City's records also indicate the average daily water consumption by the City's customers, including other towns, (Ex 508) and whether water was being diverted from the Shepaug Reservoir through the tunnel on a given day. (Ex 514)
Official records establish that the City operates its water supply system in a manner that results in a much greater impact on natural resources than is actually necessary to meet the needs of Waterbury's users of water. The City's average daily demand is, and has been since between 16 and 17 million gallons per day.[2] This figure includes water sold to the intervenor towns and some other municipal entities. Daily records maintained by the City, Exhibit 514, make it possible to determine how much of the water being sent to the water treatment plant for use in the system on a given day comes from diversion from the Shepaug basin and how much from the Wigwam basin, which has a watershed of approximately half the size of the Shepaug watershed (18 square miles vs. 38 square miles.) The daily records for the summer months of 1996, the summer before this suit was commenced, show that the City was taking between 13.8 and 14.2 million gallons of water per day from the Shepaug on days when the demand, as measured by the amount of water sent to the water treatment plant preparatory to distribution to customers, was between 16 and 18 mgd. This over-reliance on Shepaug diversions occurred on fourteen days in June 1996, seventeen days in July 1996, and 16 days in August 1996. On some days, the City drew 14.2 mgd from the Shepaug when the demand was less than 16 mgd. On many days that summer, the City was diverting from the Shepaug even though the Wigwam basin reservoirs were full and spilling.
Another record of use, Exhibit 516, shows that in August 1996, the City used no water from the Wigwam Reservoir, an average of 15.1 mgd from the Pitch and an average of only 3.4 mgd from the Morris Reservoir, while Exhibit 514 shows an average daily diversion of 14.4 mgd from the Shepaug River to the Pitch Reservoir. CT Page 2106
More than twenty percent of the water that Waterbury processes through its water treatment plant is non-revenue water, that is, water that does not go to paying customers. Some of this water is used in municipal buildings, which have no water meters, and some is used for such tasks as flushing hydrants. Some is lost to leakage from the pipes and other elements of the system. Waterbury has done remarkably little to curb the waste of water. It has not performed an inventory to discover leaks since 1978 (although it reportedly began one several weeks into the trial of this case). It participated to some extent in a State-sponsored residential conservation program in the early 1990's, requiring customers to ask for conservation kits, but it has made no appreciable efforts to spur residential conservation since that time, though residential users account for 60% of the billed use. Denise Ruzicka, an official at the Department of Environmental Protection with long experience in reviewing conservation measures in water supply plans, and Amy Vickers, a conservation consultant presented by the defendants, agreed that the City could reduce its demand by at least ten percent by implementing ordinary conservation measures that would not create appreciable burdens on water users. Ten percent of the average daily demand is between 1.6 and 1.7 mgd.
The water that is diverted from the Shepaug to the Wigwam basin reservoirs, if not actually used to meet the demand of the City's customers, is spilled or released from the lowest reservoir in the Wigwam basin, the Wigwam Reservoir. No party introduced any evidence to establish that the Branch Brook, into which excess water from the Wigwam Reservoir flows, has been unreasonably impaired by any feature of the operation of the City's water system. The City has not raised in its pleadings any claim that its operation of its water system is governed in any way by any statutory or contractual requirement concerning flow in the Branch Brook, nor has the Commissioner of Environmental Protection asserted that any proposed adjudication of the disputes among the parties will have any legally cognizable effect on the Branch Brook.
The City's records indicate that before 1997, the City limited the release of water to the Shepaug River between May 1 and November 1 to 1.5 million gallons per day.
After suit was filed in 1997, the City altered its operations. It increased the release to the river to between 3.5 and 4.6 mgd CT Page 2107 during the same period. Throughout the trial, the City asserted that it had released 4.5 mgd or "4 to 5 mgd" to the river during these summer months. This assertion is not accurate. Stream flow measurements performed by the City's expert witness, Dr. Kenneth Wagner, indicated the following flows (in millions of gallons per day) at the temporary gauging station that this witness identified as the best indication of release from the dam, station 3, on the dates when summer flows were measured:
6/10 6/23 7/1 7/7 7/15 7/22 7/29
4.6 3.8 3.9 3.9 4.0 3.7 4.0
8/5 8/11 8/25 9/1 9/9 9/14
4.1 3.5 4.0 3.5 3.7 4.2
The capacity of the release pipe prevents a release of more than 4.9 mgd unless the Shepaug Reservoir is so full that it is spilling from its spill gate at the same time that the release pipe is open.
The City's alteration of its modus operandi with regard to releases into the river during the pendency of this suit raises the issue whether the conduct that the court is to consider with regard to the claims of the counterclaimants is the release of 1.5 mgd in the summer period or the more recent method of operation. In closing argument, counsel for the City represented to the Court that the City "will match inflow to outflow up to 4.9 (mgd)." In its rebuttal argument, however, it amended this representation to a pledge to release to that extent only after the City has obtained stream gauges that permit the inflow measurement to be made.
Measurements of the flow and volume of water are subject to distortion by statistical analysis. Calculations of averages, that is, statistical means, can be extremely deceptive. A month with a mean flow of 4.5 mgd could, in fact, have many days of flow at only 1.5 mgd, statistically offset by the happenstance of a big rainstorm that added to the flow, causing the reservoir to spill. The median, that is, the number at which an equal number of days are greater and an equal number of days are lesser in flow, better represents what is actually happening on the river, and how frequently it exhibits the characteristics of very low flows.
In 1982, the Connecticut Water Diversion Policy Act ("Diversion CT Page 2108 Act"), Conn. Gen. Stat. § 22a-365, et seq., took effect. That Act required review by the State Department of Environmental Protection of proposed dams and other water diversions. Section § 22a-368 of that Act exempts existing diversions from review if their operators registered them. Waterbury registered its diversion from the Shepaug. Though this diversion was therefore "grandfathered" and was not subject to review as to its impact on the environment, the Diversion Act required review of any changes to any registered dam or diversion, including the use of water from a registered diversion for use by an additional town.
The registration of the pre-existing Shepaug dam diversion (Ex 519) lists the Hillcrest Fire District, the Town of Middlebury, the Thomaston Water Company, the Watertown Water and Sewer Authority, and the Watertown Fire District as its existing interconnections which were being supplied with water from the Shepaug River. An amendment to allow the sale of additional water to Wolcott was approved in 1988. Currently, two applications to expand the diversion permit are pending. One application (Ex. 528) proposes that the City be permitted to supply additional water, up to .3 mgd to the Town of Middlebury; the other (Ex. 422) proposes that the City be permitted to supply an average of .84 mgd and a maximum of 1.26 mgd to the Town of Wolcott, where wells in some additional areas have evidenced ground water contamination or failure in dry conditions. The Department of Environmental Protection is required, pursuant to Conn. Gen. Stat. § 22a-36a(10) to review these diversion applications to determine the effect on the basin from which the diversion is sought.
Demand by the Waterbury water supply system has diminished fairly steadily since the late 1980's, from average daily demand before that date of 18 to 21 mgd to demand of 16 to 17 mgd from 1988 to 1999. (Ex. 508) The witnesses attributed the drop in demand to the loss of industry that used water-intensive processes. State projections of population changes to which the state agencies refer in reviewing water supply plans predict no increase in the City's own population in the next twenty years, and a modest increase in the population of the towns that obtain water from the City's supply under the existing interconnection agreement. The City's prospects for attracting industry, businesses, and residents are enhanced by having, and for being known for having, an adequate water supply; however, no witness indicated that it is necessary to divert water from the Shepaug River in 2000 to meet the needs of users projected to need water CT Page 2109 in 2020. The safe yield of the system is sufficient to accommodate the modest growth projected in studies conducted by state agencies.
The City is required, pursuant to Conn. Gen. Stat. § 25-32d, to submit to the State Commissioner of Public Health a water supply plan containing specified information from which the Commissioner can determine whether the public need for water for the population served by the City as a water supplier will be reliably met. The statute and regulations enacted effectuating its provisions require, among other things, a description of the water supply system, including sources of supply, a calculation of demands, both present and projected, contingency plans in case of emergency, including drought, and an analysis of the impact of conservation practices. Such plans are to be revised "at such time as the water company filing the plan or the Commissioner of Public Health determines or at intervals of not less than three years nor more than five years after the date of initial approval." Conn. Gen. Stat. § 25-32d(a). This statute, at subsection (c) provides that the Department of Environmental Protection has ninety days to comment on a water supply plan, but no statute gives the Department of Environmental Protection authority to disapprove a water supply plan for environmental reasons. Accordingly, approval of a water supply plan by the Commissioner of Public Health does not signify that the plan does not involve any violation of the Environmental Protection Act.
The most recent update of Waterbury's water supply plan, dated May 1995 and updated in March, May and July 1997 (Ex 1052C), reported an average day demand of 16.75 mgd and noted the City's obligation, pursuant to a 1921 contract with the Town of Washington, to release 1.5 mgd down the Shepaug River. That plan was prepared and updated by Heitkamp, Inc., a consultant. The City reported that the safe yield of the City's water supply system, that is, the amount of usable water that system could generate even in a drought that was the worst drought in one hundred years, is 27.5 mgd. The concept of "safe yield" builds in the standard of what the system could supply even in so unusual a drought, with the result that in periods in which no such drought occurs, the yield of the system is higher, often by a very great margin, than the demand. Unlike some regulators, which use as a rule of thumb the standard that the safe yield should be a particular percentage above the average day demand, Connecticut's Commissioner has no such standard and may require a plan in which the safe yield is as little as five percent above the average day CT Page 2110 demand.
The City represented in its 1995 water supply plan that the safe yield of its system, diverting only 1.5 mgd down the Shepaug River in the summer months, is 27.5 mgd, and that the demand is 16.75 mgd. (Ex. 195). Accordingly, the City's safe yield, even during the worst drought conditions in 100 years, is fifty-five percent more than its demand. "Safe yield" is defined in the applicable state regulations, at Conn. State Regs. §25-32d-1(a)(12) as "the maximum dependable draft which can be made continuously from a water supply source without causing unacceptable effects during a critical dry period with a 1% chance of occurrence." Several experts translated the "1% occurrence" to mean a one-in-one-hundred-year drought.
The calculation of average daily demand in the 1995 water supply plan includes the demand attributable to the City's contracts obligating it to supply water to the towns of Wolcott and Watertown and a portion of Middlebury and associated town fire districts. In its 1995 water supply plan, the City estimated the total demand attributable outside the City itself as 2.40 mgd in the year 2000.
In connection with this case, the City hired a different civil engineering firm than the one that has supplied the analyses for its water supply plans to perform a different calculation of safe yield of the system. That firm, Metcalf Eddy, calculated the safe yield based not on a "dry period with a 1% chance of occurrence," the regulatory standard, but on the basis of the worst drought of record. Using this standard, Metcalf Eddy concluded that with a 1.5 mgd release to the Shepaug River the safe yield of the system was 23.2 mgd, meaning that more than 6 mgd of excess water was available over need even in the conditions present at the worst drought of record.
The court finds that scant reliance should be placed on the Metcalf and Eddy data and conclusions. The study was prepared not as a neutral assessment but to support a position in litigation, and the choices made in the study patently reveal a result-oriented approach to methodology. Though the presenter of this report agreed that watershed ratio transforms were the standard and approved methodology for calculating yield, she conceded that Dr. Fennessey's QPPQ method had been used instead, using a different surrogate stream than he himself had identified as the best one to use. Metcalf 
Eddy assumed no improvements in the efficiency of the system and no CT Page 2111 deviation from the practice of keeping water high in the Pitch by diverting water from the Shepaug in order to power turbines.
The court notes that when the City updated the water supply plan in 1997, the preparer of its update was not Metcalf Eddy but Heitkamp, Inc., which, at page III 2-A, continued in May 1999 to represent to the Commissioner than the safe yield of the system is 27.5 mgd.
Water supply plans are required pursuant to Conn. State Regs. § 25-32d-1(a)(18) to include "drought triggers," the designation of levels of fullness in the supply storage below which the system will institute various stages of response, including announcements and, at lower levels, requests for voluntary conservation.[3] Reaching a "drought trigger" does not mean, as the City has tried to imply, that the system is about to run out of water, but only that various levels of response should be begun in case rain does not arrive. The levels for such triggers are not uniform. The City chose, however, to institute the first trigger at the high level of seventy percent of storage. The City has unconvincingly attempted to suggest that the reaching of this unnecessarily high trigger is the equivalent of a supply emergency. It patently is not.
Denise Ruzicka, assistant director for inland water resources at the Department of Environmental Protection, was previously employed in the Department of Health, where she reviewed water supply plans under the standards set forth in the state regulations effectuating Conn. Gen. Stat. § 25-32d. She noted that drought triggers could include, in a water system that can be supplemented by diversions from a river, provisions that diversions would increase when certain triggers were reached. She indicated that there are definitely alternatives to the triggers now selected by Waterbury, including triggers that vary according to the season in which a level of reduced overall storage is reached.
VI. Notice Regarding Claims for Declaratory Relief
Because the City seeks a declaration that it has not breached its contract with the Town of Washington, has not violated the CEPA, has not created a public or private nuisance nor violated any existing riparian rights, it was necessary pursuant to Practice Book § 17-56 to give notice to those whose interests might be affected by the court's ruling. After giving the parties CT Page 2112 an opportunity to be heard on the content, scope and method of notice, this court issued an order on September 1, 1998, requiring notice by mail to certain large users of water supplied by the Waterbury Bureau of Water and to environmental groups identified by the parties. The court ordered service of the notice on the municipalities of Middlebury, Wolcott, Litchfield, Thomaston and Watertown, the Watertown Fire District, the Hillcrest Fire District, the Connecticut Water Company and the Connecticut Light and Power Company and on all riparian landowners with property abutting the Shepaug River whose riparian rights the City sought to have adjudicated. The Court further ordered notice to be published in the Litchfield County Times, the Waterbury Republican-American and the Hartford Courant on three occasions.
The notice informed the public and the entities listed above of the substance of the City's request for declaratory relief, the issues presented, and the method for intervening. November 3, 1998, was identified as the deadline for filing motions for joinder.
The City has presented the court with evidence of compliance with the order of notice, and no party has raised any issue concerning the adequacy of the notice nor the adequacy of compliance with the court's order.
The defendants seek only injunctive relief, and the requirements of Practice Book § 17-56 therefore do not apply to their counterclaims.
VII. Intervenors
The towns of Wolcott, Watertown and Middlebury filed intervening complaints.
On June 16, 1999, the Attorney General of the State of Connecticut; the Commissioner of the Department of Environmental Protection, Arthur J. Rocque, Jr.; and the Commissioner of the Department of Public Health, R. Joxel Garcia, ("the state intervenors") intervened pursuant to Conn. Gen. Stat. § 22a-19. The state intervenors filed a verified pleading asserting that this case "involves conduct which has, or which is reasonably likely to have the effect of unreasonably polluting, impairing, or destroying the public trust in the air, water or other natural resources of the state in that the relief sought by the plaintiff, CT Page 2113 plaintiff-intervenors, defendants, and defendant-intervenors is reasonably likely to have the effect of unreasonably impairing the public trust in the natural resources of the state either (a) by unreasonably reducing the flow in the Shepaug River or other rivers of the state or (b) by unreasonably reducing the water supplies available for the City of Waterbury's use or its customer's use." The notice of intervention filed by the state intervenors stated that they had been working to attempt to mediate the dispute but had been unable to get the parties to agree to a resolution. The state intervenors requested, at paragraph 9 of their motion, not to be designated either as plaintiffs or defendants, apparently for fear of jeopardizing any further efforts at mediating a resolution. No party objected to this request, and no party raised any issue with regard to the status of the pleadings of the state intervenors.
The Notice of Intervention filed by the state intervenors contains no prayer for relief. The rest of this document is limited to outlining certain legal obligations of the other parties with regard to submission of water supply plans; and it states at paragraph 16 that "[i]f the court finds that Waterbury's conduct as to the Shepaug River constitutes unreasonable impairment, the state intervenors support issuance of a permanent injunction, pursuant to Conn. Gen. Stat. §22a-18(a), providing any relief which the court shall determine in equity to be appropriate, including orders regulating any aspect of Waterbury's management and operation of its water collection and supply system, to insure compliance with the Environmental Protection Act of 1971, Conn. Gen. Stat. § § 22a-14-22a-20k, in a manner consistent with the public water supply needs of Waterbury and the region."
A fair reading of this pleading is that the state intervenors did not explicitly seek injunctive relief on their own behalf, but merely advocated that if injunctive relief is granted to any of the other parties, the terms of the injunction should be consonant with the CEPA and the plaintiffs' needs for a water supply.
The morning of the day appointed for closing argument, the state intervenors presented the court with a suggested text of an injunction. The court construes this submission not as a request by the state intervenors that the court enter an injunction on their behalf as claimants, since they did not, in filing their notice of intervention, state that they sought injunctive relief CT Page 2114 on their own behalf, but rather as advocacy of what terms might effectively be included in an injunction if the court finds that the counterclaim of violation of the CEPA has been proved.
VIII. Jurisdictional Issues
In their notice of intervention, the state intervenors maintain that if this court orders relief, that "any relief which is within the primary administrative jurisdiction of the Department of Public Health be directed to the applicable administrative process provided by the Department of Public Health consistent with the requirements of the Connecticut Environmental Protection Act, Conn. Gen. Stat. § 22a-14, et seq." At closing argument, the court invited the parties to comment on whether it has jurisdiction to decide all issues in the case. The only issues identified by any party as being potentially subject to deferral for initial consideration by an administrative agency are the pending water supply applications of the towns of Wolcott for additional water from the Waterbury public water supply and of Middlebury for water from that supply. Both applications have been jointly filed by the City and the town. The City, as the operator of a water supply, is subject to the requirements of Conn. Gen. Stat. § 22a-369, et seq., and regulations adopted to effectuate that statute to submit plans for modification of existing water diversions such as those proposed in the pending applications for the benefit of Wolcott and Middlebury. Such applications are subject to a hearing and adjudication by the Commissioner pursuant to Conn. Gen. Stat. §§ 22a-372 and 373.
Conn. Gen. Stat. § 22a-18(b) provides that "[i]f administrative, licensing or other such proceedings are required or available to determine the legality of the defendant's conduct, the court in its discretion may remand the parties to such proceedings." The statute further provides that the court may retain jurisdiction to determine whether the agency's administrative action has given adequate consideration to the protection of the natural resource at issue and whether the agency's decision is supported by competent material and substantial evidence.
The words of the statute thus do not deprive the court of jurisdiction, but give it discretion to refer for initial review issues that are within the jurisdiction of the Department of Environmental Protection. This court has determined that the pending applications seeking additional diversions of water from CT Page 2115 the Waterbury Water Bureau's supply system for Wolcott
and Middlebury should be reviewed first by the Department of Environmental Protection in accordance with its usual procedures for reviews of such applications. The court will retain jurisdiction of the case as authorized by the statute cited above.
IX. Effect of other Legal Provisions on Liability under the Connecticut Environmental Protection Act.
The City takes the position that it cannot be subjected to declaratory or injunctive relief pursuant to § 22a-16 of the CEPA because of the operation of certain other legal provisions granting it rights or because of administrative acceptance of its submissions concerning its conduct. The court will consider each of these claims separately.
A. Effect of authorization to take water from the Shepaug River
The 1893 Special Act invoked by the City permitted it to obtain water for its public water supply from streams and rivers in Litchfield County, not excepting the Shepaug River. This enactment did not exempt the City from any future exercise of the State's regulatory powers. Under general principles of harmonizing the provisions of statutes to give each a reasonable field for operation, this general grant is subject to the limitations imposed by the CEPA. Daley v. Liquor ControlCommission, 166 Conn. 97 (1974); Waterbury Teachers's Associationv. Furlong, 162 Conn. 390, 404-405 (1972)
B. Effect of the 1921 Contract with the Town of Washington
As has been mentioned above and as is discussed in more detail below, in 1921 the Town of Washington agreed to withdraw a bill proposing to prohibit the City from drawing water from the Shepaug River in return for an agreement to limit the City's diversion. One of the limitations included in the contract stated that the City would not reduce the flow in the west branch of the Shepaug River below 1.5 mgd between May 1 and November 1 of future years. The City argues that this agreement constitutes a waiver by the Town of Washington of any claim that a release of 1.5 mgd or greater constitutes an unreasonable impairment of the public trust in the river as a natural resource. CT Page 2116
The CEPA was enacted in 1971 and did not exist, either in its present form or in any earlier form, in 1921 when the contract was signed. The City is taking the position that the execution of a contract between two parties serves to insulate the conduct that is the subject of that contract from invocation of the CEPA by the Town of Washington. The Connecticut Supreme Court has held repeatedly that the existence of a contract term permitting conduct does not preclude the operation of a regulatory statute of general application. Real Estate Listing Service, Inc. v. RealEstate Commission, 179 Conn. 128, 136 (1979), citing West CoastHotel Co. v. Parrish, 300 U.S. 379, 391, 57 S.Ct. 578,81 L.Ed. 703 (1937); Brazo v. Real Estate Commission, 177 Conn. 515, 525
(1979); Cyphers v. Allyn, 142 Conn. 699, 705 (1955). As the Court stated in Brazo v. Real Estate Commission, supra, 177 Conn. 525, "[a]lthough the right to make contracts has long been embraced in the concept of liberty under the due process clause . . . the freedom to contract is a right qualified by the legitimate supervision of the legislature. . . . Neither the `contract' clause nor the `due process' clause has the effect of overriding the power of the state to establish all regulations that are reasonably necessary to secure . . . the general welfare of the community." (Citations omitted.)
In Elida, Inc. v. Harmor Realty Corporation, 177 Conn. 218
(1979), the Supreme Court had occasion to apply this principle where the party invoking the regulatory statute was a party to the contract at issue, the same situation as in the instant case. In Elida, the defendant agreed not to rent space in its shopping center to any tenant that would compete with the plaintiff's bakery business. When the defendant rented to another bakery, the plaintiff invoked this provision in the lease and the defendant asserted a special defense under the Connecticut Antitrust Act, Conn. Gen. Stats. §§ 35-24, et seq. The Court stated that "contracts must be understood as made in reference to the possible exercise of the rightful authority of the government, and no obligation of a contract can extend to the defeat of legitimate government authority. . . . Consequently, the state, pursuant to its lawful exercise of the police power, may rightfully prohibit the continuance in the future of those things already in existence which are deemed injurious to the rights and interests of its citizens so as to justify such an exercise of the power whether the continuance of the things is provided for by contract or not." (Citations omitted) Elida, Inc. v. HarmorRealty Corporation, supra, 177 Conn. 224. Notably, the Court did not find that the defendant was estopped from invoking the CT Page 2117 Antitrust Act, nor that it had waived the right to invoke its provisions.
The principles set forth above were held to apply to contracts entered into by public entities in Ansonia v. Ansonia Water Co.,101 Conn. 151 (1924). The authority of municipalities to make contracts does not supersede the power of the State to legislate for the protection of the public welfare. Id., 162.
Determining that Connecticut's natural resources, including water, are a public trust, our legislature found "that each person is entitled to the protection, preservation, and enhancement" of those resources and that "it is in the public interest to provide all persons with an adequate remedy" to protect them. Conn. Gen. Stat. § 22a-15. By enacting the CEPA, our legislature expressly sought to protect the public welfare.
This court finds that the law does not support the City's claims that the Town of Washington is estopped from invoking the Connecticut Environmental Protection Act, nor that it has waived its protections by entering into a contract many years before those protections existed. "Waiver is the intentional relinquishment of a known right." Dragan v. Connecticut MedicalExamining Board, 223 Conn. 618, 629 (1992); Hensley v.Commissioner of Transportation, 211 Conn. 173, 178-179 (1989);Cutlip v. Connecticut Motor Vehicles Commissioner, 168 Conn. 94,96 (1975). To constitute waiver "there must be both knowledge of the right and intention to relinquish it." (Citation omitted)Breen v. Aetna Casualty Surety Co., 153 Conn. 633, 647 (1966). Since the CEPA did not exist in 1921, when the Town was endeavoring to take some steps to preserve the flow of the Shepaug River, the protections it offered to the interests that the Town of Washington was attempting to safeguard by contract were not a "known right" at the time, and the town cannot logically be viewed as having intentionally waived such protections.
None of the other defendants had contracted with the City concerning any rates of release, and these claims of estoppel and waiver have no application to them.
C. Effect of Registration of Existing Diversion
In 1982, the General Assembly enacted the Water Diversion Policy Act, Conn. Gen. Stat. § 22a-366, et seq. The Diversion Act CT Page 2118 requires the Department of Environmental Protection, in consultation with the Department of Public Health, to evaluate requests to divert water from rivers and streams after the date of the statute's enactment. Section 22a-368 provided, however, that existing water diversions did not have to undergo the permit application process specified in the Diversion Act if these diversions were registered by July 1, 1983. The City duly registered its diversion of water from the west branch of the Shepaug River. Since the Act required a registrant to specify the location, capacity and frequency as well as other facts concerning the existing diversion, the parties agree that any expansion or change requires an application for a permit to the extent of the new features of a diversion. The City now takes the position that such registration insulates the diversion that existed in 1983 from further scrutiny by way of a claim of unreasonable impairment of the public trust in a natural resource under the CEPA.
The Diversion Act contains no provision exempting existing diversions from the coverage of the CEPA. Its effect on such existing diversions is simply to relieve registrants of the requirement of applying for a permit. Contrary to the City's argument, the acceptance of a registration certificate does not, under any provision of the Diversion Act, constitute an approval of the diversion. The plain and only effect of the registration provision is to relieve those with existing diversions from the need to file an application for a permit, not to render such diversions immune from regulation under other statutes. The City's assertion to the contrary is not supported by any statutory language or other authority that would support such an interpretation.
D. Existence of Adequate Existing Administrative and Regulatory Procedures
The City observes in its brief that no relief may be granted to the counterclaimants on their cause of action under the CEPA, because a provision in that Act, Conn. Gen Stat. § 22a-20, provides:
 Nothing herein shall prevent the maintenance of an action, as provided in said sections, to protect the rights recognized herein, where existing administrative and regulatory procedures are found by the court to be inadequate for the protection of the rights. CT Page 2119
The City has failed to identify the administrative or regulatory procedure that it claims is adequate for the adjudication of the issues raised in the counterclaimants' CEPA claim. Because, as is discussed above, the water diversion at issue was grandfathered from the permit process set forth in the Diversion Act, the text of the Diversion Act and the testimony of witnesses establish that no review of the diversion as registered in 1983 will occur under the administrative processes of that statute.
The City observes that Conn. Gen. Stat. §§ 26-141b and 26-141c
set forth regulatory standards concerning minimum flow standards in streams stocked with fish by the Commissioner of Environmental Protection and a procedure for adjudicating violations of those standards. The evidence does not establish that the west branch of the Shepaug River is a stream which the Commissioner stocks with fish, though a private association of fishermen, the Washington Rod and Gun Club, does so. The cited statute and effectuating regulations thus have not been shown to apply. Thomas Morissey, an official at the Department of Environmental Protection, testified that the Shepaug River is not one which his department regulates under the cited statutes.
The City mentions in its brief, at page 42, that pursuant to Conn. Gen. Stat. § 25-32(a) and regulations promulgated thereunder, the Connecticut Department of Public Health "regulates water supplies to assure the quality of the water." The Department of Public Health is also charged with the responsibility of approving "water supply plans submitted by water companies under Conn. Gen. Stat. § 25-32d(a)." Though the City implies that the review of its water supply plan is an occasion to determine whether it is violating the CEPA in the manner in which it obtains its water supply, the text of the cited statutes in no way supports this conclusion. Witnesses familiar with the review of water supply plans and counsel for the Department of Public Health negated any inference that review of the Waterbury water supply plan at any time included or could, under the provisions of the applicable statutes and regulations, have included any review of the diversion of the water from the Shepaug River and the limitations on releases to the river in summer months to determine whether a violation of the CEPA was occurring.
The City asserts without basis that the approval by the CT Page 2120 Department of Public Health of a water supply plan representing the safe yield of its system to be 27.5 mgd constitutes a requirement by the State that Waterbury must divert water from the Shepaug River to the extent set forth in the water supply plan. Again, the text of the statutes and regulations concerning water supply plans do not support this interpretation. Denise Ruzicka, who has served in relevant positions in both the Department of Public Health and the Department of Environmental Protection, credibly testified that no particular safe yield is required, and that water supply plans are approved for water systems with a safe yield only five percent higher than average daily demand.
This court concludes, based on the testimony and examination of the statute and regulations, that approval of a water supply plan means only that the Department of Public Health is satisfied that the submitting water supplier has included the required information and has conducted the studies that should alert it to the possible need to seek out additional supplies of water to meet projected needs. The effect of approval is not to require a supplier to divert a particular amount of water or to operate its system in a particular way.
The court concludes that there is no existing regulatory or administrative procedure adequate for protection of the rights that the counterclaimants seek to protect.
X. CLAIM OF VIOLATION OF THE CEPA
A. Is there Impairment?
The basic issue presented in this case is whether the City is diverting water from the west branch of the Shepaug River in a manner and to an extent that constitutes an "unreasonable impairment" of the public trust in the river as a natural resource in violation of the CEPA. The parties agree that a flowing river is a natural resource. Indeed, such features of the environment have been so recognized in another environmental statute, Conn. Gen. Stat. § 22a-36. The crucial phrase in §22a-16 is "unreasonable impairment." Neither the phrase nor either of its component terms, "impairment" and "unreasonable," is defined in the state's Environmental Protection Act. General principles of statutory construction therefore apply. Paige v. Town Plan Zoning Commission, 235 Conn. 448, 454 (1995). CT Page 2121
The Connecticut Supreme Court has very recently, in Burke v.Fleet National Bank, 252 Conn. 1, 11 (2000), summarized the process and principles that apply to construction of a statute:
 The process of statutory interpretation involves a reasoned search for the intention of the legislature. Fricilli v. Westport, 231 Conn. 418, 431, 650 A.2d 557 (1994). In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . Id.; Carpenteri-Waddington, Inc. v. Commissioner of Revenue Services, 231 Conn. 355, 362, 650 A.2d 147 (1994); United Illuminating Co. v. Groppo, 220 Conn. 749, 755-56, 601 A.2d 1005 (1992). (Internal quotation marks omitted.) Bortner v. Woodbridge, 250 Conn. 241, 258-59, 736 A.2d 104 (1999).
"Legislative committee hearings may be relevant to the meaning of statutes because they often demonstrate the problem or issue that the legislature sought to address by the statute." Burke v.Fleet National Bank, supra, 252 Conn. 17, citing Ferrigno v.Cromwell Development Associates, 244 Conn. 189, 197 (1998), andMahoney v. Lensink, 213 Conn. 548, 559-60, (1990).
"Impairment" is identified in Webster's Third New International Dictionary as the noun form of "impair," which that dictionary defines as "to make worse, to diminish in quantity, value, excellence or strength, to do harm to." Black's Law Dictionary (7th Ed.) defines "impairment" as "the fact or state of being damaged, weakened or diminished."
The Supreme Court made it clear in Paige v. Town Plan ZoningCommission, supra, 235 Conn. 458-61, that Connecticut's environmental protection statutes are not limited to protecting resources with demonstrable economic value. In that case, however, the Supreme Court did not reach the meaning of "unreasonable impairment" because it reversed the trial court's finding that trees did not constitute a natural resource.
The conduct that the defendants characterize as unreasonable CT Page 2122 impairment in the case before this court is the diversion of particular quantities of water from the west branch of the Shepaug River. The defendants allege that this diversion impairs the river itself by reducing its summer flow and altering its natural condition. They also assert, apparently both as instances of the consequences of reduced flow and as separate impairments of natural resources, that Waterbury's diversion of water harms the fish population and the "benthos," a term used to refer to the population of such organisms as caddis flies, May flies, and stone flies, which are part of the ecology of a river and which, along with other roles, supply food for fish. The defendants also assert that the diminishment of flow impairs the suitability of the river for recreational uses and diminishes its appearance and aesthetic properties.
The conclusion is inevitable that the erection of a dam across a river alters that river. Instead of having a natural flow, including natural seasonable variations in the amount of flow, a dammed river is affected by the storage function of the dam, which operates to hold some of the water from periods of high flow for use in some manner during periods of low flow. The use that the City of Waterbury makes of the stored water is for diversion to another watershed basin for use as a public water supply. The use on which the defendants focus is not the existence of the dam but the operation of the diversion tunnel and its effect on the release of water to the Shepaug River during the summer. In oral argument, the Department of Environmental Protection suggested that the issue in deciding whether the operation of a dam, that is, the extent of storage of water and the extent of limitation of release of water, constitutes an impairment that is "unreasonable" is to determine whether that operation reduces the flow of the river to a greater degree than some reasonable standard of flow. The Department of Environmental Protection asserted that the standard to use is a standard that is recommended by the U.S. Department of Fish and Wildlife for maintaining the health of streams for fish. That standard is based on the median natural flow rate for the month of August, that is, the flow rate reached on fifty percent of days in August, arrived at by calculations of that median flow rate over a twenty-five year period of measuring August flow rates.
The defendants likewise take the position that a summer flow rate on the west branch of the Shepaug River is an "unreasonable impairment" of the public trust in the river as a natural CT Page 2123 resource if the flow resulting from releases by the dam during the summer is less than the median August flow.
If there were no dam, the flow of the river would, of course, be variable. There would be times when the natural flow was less than the median August flow and times when it would be greater.
The U.S. Fish and Wildlife recommendation of August median flow appears to be limited to the context of the goal of creating an environment for fish that is more favorable than nature would afford some streams at some times, protecting fish from natural flows at levels below the median August flow. While this standard may be effective in the context of a goal of creating an improved environment for fish, it is by no means clear that it should serve as a measure of unreasonable impairment of a river. To adopt such a standard would be to hold that a river is "unreasonably impaired" if its summer flows are not maintained in a manner that may be an enhancement over its natural state. Use of such a standard of impairment might also result in allowing an excessively low flow as compared to the natural flow of the river in months other than August.
The court also recognizes that the median August flow is not the standard adopted in Connecticut's own regulations for the purposes of protecting fish in rivers stocked by the state that have dams or other diversions. Instead, those regulations, at Conn. State. Regs. § 26-141a-6(f), provide that "no release shall be required which is in excess of the natural flow of water into the. . . . diversion on that day."
The defendants have not contended that the storage of water in the reservoir during the winter and spring constitutes an "impairment." Rather, they claim that the impairment is the low release in the summer.
This court concludes that the ordinary meaning of the word "impairment" is best adhered to by considering whether the summer flow of water in the river is reduced below its natural flow in the months of May through October. Making this determination would be relatively simple if there were reliable evidence of the natural flow in the west branch of the Shepaug above the dam. No such data are available, and the configuration of the Cairns Reservoir, which extends right up to the small streams that come together to form the west branch of the Shepaug, apparently precludes obtaining any accurate measurement of natural flow now. CT Page 2124
The City has offered some anecdotal evidence of the summer flows on the Shepaug before construction of the dam, notably, undated photographs of a nearly dry river. Context is everything. These photographs may have memorialized the one and only time the river ever had this appearance. Photographs taken during the construction of the Shepaug dam may reflect stream diversions undertaken to facilitate construction. An elderly fisherman's assertions to the effect that all the rivers he fished in northwestern Connecticut since 1940 dried up in the summer months was too vague to be helpful. This witness' disinterestedness in describing the upper portions of the Shepaug before the Cairns reservoir was built was, moreover, subject to doubt in view of the revelation that he had long been one of a sixteen-member club, known as Marshepaug Forest, Inc., favored by the Waterbury Water Bureau above the rest of the City's residents by being granted an exclusive right to fish and hunt on the City's watershed lands. Other witnesses familiar with rivers in northwestern Connecticut did not agree that the extent of diminishment of flow was so considerable.
The court finds more probative on the issue of natural summer flow of the portion of the river in question the various models of watershed productivity prepared by hydrologists, biologists, and stochastic hydrologists on behalf of the parties. These witnesses used the same general approach of taking measurements of flow from long-duration stream gauges at roughly similar rivers in the same general area, then performing mathematical analyses to estimate the flow of the upper portion of the west branch of the Shepaug, making adjustments to reflect differences in the size of the watershed and other factors. The stream gauges were placed and maintained over thirty years or more by the U.S. Geological Survey. The measurements from such gauges throughout the year for a long period allow calculation of flow rates and predictions of the likely flow rate at various times of year of a river on which no gauge exists.
The favored methodology is to perform the analysis using a gauged stream that is as closely similar, with regard to rainfall, climate, geology, and terrain, as possible to the stream for which a flow rate is being modeled. In choosing a surrogate river from which to model, it is good practice to consider whether the gauged stream is itself affected by dams and diversions which distort its natural flow. CT Page 2125
The court found credible the testimony of Robert Melvin, who served for thirty years in the U.S. Geological Survey and retired as chief of its hydrology section, having spent most of his career on work concerning rivers in Connecticut, to the effect that the most widely used, accepted method of performing the analysis described above is a method known as watershed ratio transform.
The stochastic hydrologist presented by the City, Dr. Neil Fennessey, instead used a statistical approach that had been the basis of his doctoral thesis, which he called the QPPQ method. Though the City presented some evidence that suggested that this method resulted in a higher level of statistical reliability than the traditional watershed ratio transform method (that is, it produces approximations of flow for a particular ungauged stream that are similar if several different gauged streams are used as the basis for calculations) the court is not convinced that the QPPQ method is in fact superior in calculating the flow of a particular ungauged stream to a watershed ratio transform performed on the basis of a well-selected surrogate stream.
Mr. Melvin testified that the Pomperaug River, on which the U.S. Geological Survey had maintained stream gauges from 1952 to 1994 in Southbury, was a suitable river to use as a surrogate in performing a watershed ratio transform to calculate the likely natural flow of the west branch of the Shepaug River. While he opined that the Salmon Creek, with a stream gauge in Lime Rock, Connecticut, was also an acceptable surrogate from which to perform a transform, this court is convinced that the greater similarities of location and terrain make the Pomperaug a more suitable surrogate for performing a transform.
Dr. Fennessey, despite his preference for his QPPQ method, also performed calculations using the watershed ratio transform method, using stream data from the Pomperaug River. That analysis yielded the following estimations of the natural flow in each month in the west branch of the Shepaug River. (Ex. 129 p. 4-1). The numbers indicated are of median flow, that is, the rate of flow that was reached on half the days in that month, and the numbers reflect millions of gallons per day
Jan. Feb. Mar. Apr. May June Jul. Aug. Sept. Oct. Nov. Dec.
31.5 37.5 60.1 57.7 34.3 13.8 7.6 6.5 6.1 9.8 23.7 37.7

The court finds that the flow rates set forth above represent CT Page 2126 the best evidence available of the natural flow for each month in the west branch of the Shepaug River above the confluence of the Shepaug with the Bantam River.
To determine whether that flow is impaired by the City in operating its reservoir system and diversion tunnel, the above figures must be compared to the summer flow that Waterbury represented to the court it would release: matching the outflow to the inflow except that the release would not exceed 4.9 million gallons per day. Scrutiny of the monthly median figures set forth above indicate that in the dry summer months, the months when the defendants claim that impairment is occurring, the level of flow proposed by the City is less than the natural median flow from May through October. Comparing Dr. Kenneth Wagner's measurements of actual flows on particular days during the summer of 1999 established an impairment for each month in which measurements were recorded, as follows:
June July Aug. Sept.
Median natural flow (as modeled by Dr. Fennessey) 13.8 7.6 6.5 6.1
Flow created by Waterbury (as measured by Dr. Wagner) 3.8-4.6 3.7-4.0 3.5-4.1 3.5-4.2
Because the evidence established that the release through the eight-inch pipe never exceeds 4.9 mgd, the counterclaimants also established impairment for the month of May, for which the court finds the natural median flow to be 34.3 mgd.
Prior to the filing of this suit, the impairment was even greater, since the City was releasing only 1.5 mgd between May 1 and November 1. At a constant release at the level achievable by leaving the eight-inch release pipe open, the natural flow of the river is diminished by about thirty-five percent in August and up to seventy percent in June. Such a diminishment constitutes a substantial "impairment".
The City has argued to the effect that it is not enough for the defendants to demonstrate that the public trust in the river as a natural resource is impaired by a reduction of the summer flow, but that this reduction must be shown to have an effect on the flora or fauna or some other natural resource as well. The words of the statute do not contain any such requirement of a showing CT Page 2127 of particular consequences of an unreasonable impairment of the natural attributes of a natural resource.
The City takes the position that since the Michigan Environmental Protection Act, M.C.L. § 324.1701, et seq., was to some extent used as a model for the Connecticut statute, various factors taken into consideration by the Appellate Court of Michigan in two cases must be used as the standard for Connecticut's courts in construing the CEPA. In fact, Michigan's Supreme Court, in Nemeth v. Abonmarche Development, Inc.,576 N.W.2d 641, 649-50 (Mich. 1998), has specifically rejected the use of the Michigan Appellate Court's check list for determining impairment and has stated that each claim of impairment must be judged according to a standard appropriate to the particular claimed violation. The Michigan Supreme Court specifically ruled that "plaintiffs are not required to show that a multitude of natural resources are affected" or that the impaired resource is unique. Id. Michigan's highest court rejected reliance on the list of factors in the lower court rulings cited by the City of Waterbury.
The defendants established, however, that the effect of reducing flow to the extent that the City does during the summer months reduces the amount of wet stream bed, the habitat for the insects that are part of the river's ecology. They also proved that the City's diversion of water reduces the aesthetic appeal of the river, since large areas are left dry and parched-looking more frequently than would be their natural state.
The defendants endeavored to prove in addition that the low summer flows reduces the health of the river for fish, especially brown trout and brook trout. The court did not find that this claimed effect was proven. The persuasive evidence concerning the likely natural flow of the river in the summer months suggested that the water would, even at natural flows in most summers, be too shallow and too warm in the area between the Shepaug and the confluence with the Bantam to support trout to any great extent, since trout require cool temperatures and water deep enough to create pools in which to hide.
As has been explained above, however, the CEPA does not require demonstration of impairment to multiple natural resources. This state's environmental policy, as set forth at Conn. Gen. Stat. §22a-1a(b), includes not only considerations of human health and safety, but also the policy of "assur[ing] for all residents of CT Page 2128 the state safe, healthful, productive and esthetically andculturally pleasing surroundings." (Emphasis supplied.) The announced environmental policy of Connecticut includes not only protecting resources that are useful or economically productive, but also those that have value as settings for recreation and for the appreciation of habitats that are natural.
The court finds that the City has failed to prove that its promised flow does not impair the public trust in the river as a natural resource, and the counterclaimants have proven impairment.
B. Is the Impairment Unreasonable?
The CEPA does not make all impairments subject to declaratory or injunctive relief, but limits such relief to "unreasonable impairments." In Manchester Environmental Coalition v. Stockton,184 Conn. 51, 58 n. 10 (1981), the Connecticut Supreme Court rejected the argument that the word "unreasonable" was intended to permit the balancing of major state policies and competing interests: "The clear legislative history shows that this was not the intent." The Court explained that the word "unreasonable" was included to bar suits based on impairments that were so negligible that they would be asserted only for reasons of spite or for harassment. Id.[4] The court based this conclusion on the comments of a legislator who had explained that the Act was not meant to make actionable, such "impairments" of the natural resources as the discharge from a person's exhalation of breath.
In Gardiner v. Conservation Commission, 222 Conn. 98, 109
(1992), a case involving the Inland Wetlands and Water Courses Act, Conn. Gen. Stat. §§ 22a-37, et seq., conduct regulated under this statute, like conduct regulated under the CEPA, was held by the Supreme Court to be subject to the standard of review set forth in Conn. Gen. Stat. § 22a-19(b):
 In any . . . proceeding, the agency shall consider the alleged unreasonable . . . impairment . . . of the public trust in the air, water or other natural resources of the state and no conduct shall be authorized or opposed which does, or is reasonably likely to, have such effect so long as, considering all relevant surrounding circumstances and factors, there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety and welfare. CT Page 2129
The Court in Gardiner stated that "the determination of whether a specific degree of contamination or other environmental detriment is unreasonable may often turn on the availability of alternatives. Even minimal environmental harm is to be avoided if, `considering all relevant surrounding circumstances and factors, there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety and welfare.'" Gardiner v. Conservation Commission, supra,222 Conn. 109. This analysis suggests that the issues of competing interests in the natural resources and reasons for creating the impairment are to be considered not in assessing whether an impairment is unreasonable, but in determining whether a party that has caused an impairment has proved its affirmative defense, as provided in Conn. Gen. Stat. § 22a-17, by proving that "considering all relevant surrounding circumstances and factors, there is no feasible and prudent alternative to the defendant's conduct and that such conduct is consistent with the reasonable requirements of the public health, safety and welfare." Id. Though a different environmental statute was at issue inGardiner, the Court's discussion of "unreasonable impairment" seems unlikely to be different for one environmental statute than for another, especially since both Acts also require consideration of the existence of feasible and prudent alternatives.
Contrary to the City's assertions, the Connecticut Supreme Court did not reach the issue of defining an "unreasonable" impairment in Paige v. Town Plan Zoning Commission, supra,235 Conn. 448. The trial court had dismissed the wetlands appeal at issue upon finding that trees were not a natural resource. It did not therefore reach, nor did the Supreme Court reach, the issue of whether the conduct at issue constituted an unreasonable impairment of that natural resource.
Even if the Supreme Court were to construe "unreasonable" in a manner that went beyond the elimination of effects so minimal that to raise them was mere harassment, in other words, the standard that the Court found to be the sole standard supported by the legislative history, as quoted in Manchester EnvironmentalCoalition v. Stockton, supra, 184 Conn. 51, the defendants have demonstrated an impairment that is much more considerable than that low threshold. The releases in the summer of 1999 that the City suggests resulted from full use of the eight-inch release pipe produced flows that were at least a third less, and usually CT Page 2130 a much greater diminishment than a third, from the natural flow as established by the ratio transform method modeled on the Pomperaug River as a surrogate. The width of the wet portion of the river and the appearance of the river are appreciably diminished by the diversions at issue.
Based on the controlling precedents discussed above, this court concludes that the impairment of the river's flow identified by the defendants is not so minor that invoking it can only proceed from spite or a desire to harass, the standard indicated inManchester, supra. The court finds that the defendants have made a prima facie case of unreasonable impairment of the public trust in the natural resource at issue, a flowing river.
C. Has the City Proven the Absence of a Feasible and Prudent Alternative?
The impairment of the summer flow of the west branch of the Shepaug River between the Shepaug Reservoir dam and the confluence with the Bantam River is caused by the City's method of operating its water system, and the physical limitations of the release equipment currently in the Shepaug dam. The City takes the position that it must operate its water system precisely as it does in order to meet the needs of the users of that system, including those towns and other entities with which it has contracted to provide water. Prior to the commencement of this litigation, the City was limiting release to the Shepaug River from the dam to 1.5 mgd between May and the end of October each year.
It was a fundamental premise of the City's presentation thatany measure that would impose a financial cost or require it to change the amount of water it diverts from the Shepaug side of its system or the amount of water it uses from its various reservoirs would not be feasible and prudent. The only alternative to its pre-litigation impairment of the river about which the City presented evidence was the method of operation by which it released in the summer of 1999 not a daily flow of 4.9 mgd, but a release that varied between 3.5 and 4.6 mgd from June through September. Having represented to this court that its present policy is to release the lesser of the inflow or 4.9 mgd, the City has apparently conceded that this course is also a feasible and prudent alternative.
Since the flows that result from the alterations in its CT Page 2131 operations that the City has identified as feasible and prudent alternatives still result in a flow that is far less than the natural flow, and thus an "unreasonable impairment" of the public trust in this natural resource, the court must determine whether the City has proven that there is no feasible and prudent alternative to these operations. To prove the nonexistence of a feasible and prudent alternative as defined in Conn. Gen. Stat. § 22a-17, a party can be expected to posit alternatives and then demonstrate that they are not feasible or prudent because of the difficulty or degree of financial burden involved in implementing them in a way consistent with providing a sufficient, safe water supply.
In this case, the City did not proceed in this way. The only alternative about which it offered any evidence was the method by which it operated the water supply during the summer of 1999, in anticipation of trial of this case. The City did not analyze any other alternatives other than to take the position that an alternative presented by the defendants is not prudent. Rather than simply find, however, that the City failed to discharge its burden of proving its special defense of the absence of a feasible and prudent alternative, the court will assess the alternatives proposed by the defendants.
Those alternatives were prepared by Stewart Stein of GKY 
Associates, a civil engineering firm which specializes in engineering assistance to public water supplies, including, currently, studies and projects conducted concerning the public water supply for the cities of New York, Denver and Richmond. Mr. Stein's expertise is in preparing models to show the outcomes for provision of water under various operating rules. Operating rules are the guidelines used by a water supply entity in managing its reservoirs. Such rules include, for example, the height at which to maintain a reservoir to catch runoff, the amount of water to use from each reservoir as well as the timing for using each reservoir, and the kinds of intakes structures, pumps, and release structures to install in order to maximize the quality of the water used for distribution to customers.
Using computerized statistical modeling based on known figures for demand (water use) by the City's customers, Mr. Stein demonstrated that changes in operating rules would enable the City to meet a demand of 3 mgd over its actual present demand of 16.75 mgd while 10.5 mgd was being released to the Shepaug River in summer months. Daniel Sheer, an expert witness presented by CT Page 2132 the City to critique Mr. Stein's calculations, acknowledged on cross examination that it was feasible for the City to make greater releases that 4.5 mgd from the Shepaug Reservoir at times in the summer months and that, in his estimation, prudent operating rules could be developed that would allow a greater release to the Shepaug and still meet the water supply needs of Waterbury's customers.
Much of Dr. Sheer's testimony concerned assessing whether the operating rules analyzed by Mr. Stein, if analyzed in view of the historical experience of the system over a period of years, would result in frequently reaching the 70% full mark in the reservoirs on the Wigwam side of the system. This level is a "drought trigger" under the City's current water supply plan that was approved by the Connecticut Department of Public Health. While Dr. Sheer was willing to imply, on direct examination, that the reaching of a statistical trigger level was the equivalent of a lack of drinking water, he readily agreed on cross examination that this and other trigger levels meant no such thing and that it was highly likely that the Department of Public Health would accept other trigger levels. The evidence presented indicated that, in fact, the Department had suggested that Waterbury vary its drought triggers accordingly to the season, to reflect the fact that a particular level has different significance depending on whether the period is one of high or low use and the expected future patterns of precipitation. Waterbury had not done so, and its adoption of the same triggers regardless of time of year accounted for much of the criticism of the frequency with which the Stein operating rules would mean reaching drought triggers.
Dr. Sheer was not asked by the City to prepare any models of alternative ways of operating the City's water supply system, but only to critique Mr. Stein's study. Dr. Sheer testified, however, that based on his own study of the system, there were times in summer when it would be feasible and prudent to release as much as 8 mgd into the Shepaug River. He also testified that in his estimation alternatives are feasible that would increase the release of water into the Shepaug, an estimation supported by the fact that during the pendency of this lawsuit the City has released more water than the 1.5 mgd in the summer that had been its prior practice.
The witnesses presented by the City implied that it would not be prudent to make greater releases to the Shepaug now, when the demand from City water users, including those in other towns, is CT Page 2133 less than 20 mgd in the summer and 16.75 mgd on average, because in twenty or more years the demand may increase. No witness who advanced this theory explained any manner in which taking more water from the Shepaug River at present would address water demand in twenty years. Though the Department of Public Health, pursuant to Conn. Gen. Stat. § 25-32d(b), requires that water supply plans contain an analysis of the projected future population, and thus of future projected increased demand, there is no requirement that the system currently operate as though such demand were already being made. Logic would suggest that a water supply company could comply by indicating what changes in diversions from a river it would implement as demand grew.
The only reason advanced by Dr. Sheer for his assumption that the City must currently divert water as though it already had a much higher demand for water is that otherwise those who use the Shepaug River would become used to its having a higher flow and resist change. The court finds that such a rationale in no way proves the absence of a feasible and prudent alternative to a method of operating the water system that currently constitutes as unreasonable impairment.
Mr. Stein's models are, of course, simply models. The Court does not conclude that the water system could be operated exactly in accordance with the operating rules on which the Stein/GKY models are based. This evidence does, however, indicate that there are feasible and prudent alternatives to the present method of operation, and the City's own witness, Dr. Sheer, admitted as much.
The City presented evidence to the effect that even if feasible and prudent alternatives existed, they would impose some costs, either financial, or in terms of inconvenience, upon the City. The CEPA does not provide that an unreasonable impairment cannot be ordered to be remedied if to do so would impose any cost. Were such the standard, it is unlikely that any protection of the environment would ever occur, since most alterations of natural resources are undertaken to shift their value to the party using them, such that a change would mean an economic loss to that party.
The extent of financial or other costs involved in an alternative to the condition that is identified as an unreasonable impairment of the public trust in a natural resource is, however, logically a factor to be considered in determining CT Page 2134 whether an alternative is "feasible and prudent." An alternative with an extremely high cost might not be considered prudent. Connecticut appellate case law does not identify factors to be considered in determining whether an alternative is "feasible" or "prudent."
The City asserts that if it were to meet more of its demand for water from the reservoirs in the Wigwam basin, instead of diverting so much water from the Shepaug River, it would incur higher energy costs by pumping from downhill reservoirs to the water treatment plant and from powering the high service line by means other than the use of the flow pressure head from Pitch Reservoir to the turbines. The only evidence concerning cost was an electric bill for a brief period of use of the Wigwam that was roughly the same as bills for preceding months in which no use had been made of the Wigwam Reservoir. No figures were presented to establish the cost of powering the turbines by alternative means.
The City presented the testimony of an economist, Dr. John Boland of Baltimore, Maryland, who did not calculate actual financial costs that would be incurred, but only presented the hypothesis that all water diverted from the Shepaug must have a value to the City, even if it was not actually sold to customers. Dr. Boland calculated the so-called "social cost" of that unused, unbilled water. Though Dr. Boland's report contained an extremely elaborate mathematical formula, all of the figures used in implementing that formula were based on assumptions, not real data.
Dr. Boland confirmed the testimony of a defense witness, Amy Vickers, that the City's water conservation plan, set forth in its water supply plan, appeared to be a pro forma document prepared simply to have a document with such a title as a required element of a water supply plan, as listed in Conn. State Reg. 25-32d(1). The evidence established that the City has conducted no appreciable conservation efforts since 1993, when it distributed some low-flow appliance fittings under a State program. Several witnesses testified that the City could very likely achieve a ten percent reduction of its demand figure merely by undertaking conservation measures such as reducing the number of leaks in the system and reducing the amount of water produced for uses not accounted for in the City's system. The City had not undertaken a leak detection program for approximately ten years and did so only after trial of this case CT Page 2135 had actually begun. This court concludes, based on the testimony of Ms. Ruzicka, Ms. Vickers, and Dr. Boland, that ordinary conservation measures, long neglected by the City, would do much to vitiate the feared effects of lesser diversions from the Shepaug.
The City presented estimates, which cross-examination revealed to be very rough, of the cost of various alterations to the valves, intakes, and other equipment that would be necessary to achieve a release to the river at the 10 mgd level assumed in Mr. Stein's model. The cost of the changes needed to achieve the considerably lower levels of flow that this court has found to constitute the natural flow of the river was not analyzed by the City; however, some of the same elements would logically be necessary, as follows:
 Re-engineering of outlet to Shepaug River to produce higher flow: $250,000
 Crest gate to increase storage capacity of Cairns Reservoir: $275,000
The evidence of costs presented by the City includes costs projected as needed if the Wigwam Reservoir were to be used on a daily basis as a greater source of water supply. The operating rules proposed by Mr. Stein do not assume such daily use, but only that this reservoir be kept available for potential use in very dry conditions. Such brief use of the Wigwam Reservoir in September 1999 was possible without the new pumping equipment claimed by the City to be a cost.
Contrary to the assertions of the defendants, this court considers that the actual cost to alter the water supply system is an element to be considered in assessing whether there is a feasible and prudent alternative to a system of operation that results in an unreasonable impairment of the public trust in the river. The only actual expenses, however, (as opposed to hypothetical "social costs" from reductions in excess water diverted) that the court finds to have been proven by a fair preponderance of the evidence, are the above items that total $475,000, plus the cost of installing a stream gauge to monitor the release to the river. That cost was estimated to be $27,000.
This sum was not shown to be an expense so burdensome as to make the alternatives of ending or at least decreasing impairment CT Page 2136 of the river infeasible or imprudent. The City's water supply plan indicates anticipated expenditures for system improvements on an annual basis of approximately $1.8 million for 1999-2000 (Ex. 195) and greater amounts in other years. The one-time expenditure of approximately $500,000 does not seem imprudent or infeasible in this context of expenditure. While the evidence established that the City operates its system as it does partly to use water pressure from the full pitch reservoir to power turbines, the court was not presented with evidence of the cost if operating rules were altered to keep the Pitch lower through lesser diversions from the tunnel.
The evidence as a whole suggests that, in fact, there are feasible and prudent alternatives by which the safe yield of the system could meet and exceed the demand of the users of the water supply within the standards of the Department of Public Health while removing or very substantially reducing the unreasonable impairment of the public trust in the river. The City has failed to prove its special defense of a lack of feasible and prudent alternatives to its unreasonable impairment of the public trust in the Shepaug River as a natural resource.
XI. Special Defenses to Statutory Claim
A. Statute of limitation
Other than the defenses discussed at Part IX above, the only special defense to the CEPA claim that the City has briefed is its claim that the statute of limitation has run. Assuming that the statute of limitation applicable to torts, Conn. Gen. Stat. § 52-577, applies, the issue is whether the counterclaimants have proven a violation of the CEPA within the three-year period preceding the institution of their claim, in July 1997.
The City argues as though the cause of action arose either when the Shepaug dam was constructed or when Waterbury built its water treatment plant. The City misconstrues the defendants' claim, which is that the City is operating its water supply system each year in a manner that results in an unreasonable impairment of the river. In July 1997, the date the suit was filed, and for the three years prior to that date, the City was limiting the release of water to the Shepaug River to 1.5 mgd in the summer months. The City's present proposal is to alter its operations to some extent, but still to unreasonably impair the flow by reducing it below the natural flow in the summer months. The conduct for CT Page 2137 which injunctive relief is sought is conduct that has occurred within three years prior to the institution of the defendant's statutory claim. The City's statute of limitation defense to this claim is without merit.
B. Laches
The City further asserts that the defendants' claim for injunctive relief is barred by the doctrine of laches. Again, the City argues that the defendants were required to seek relief before the dam was built, or before the water treatment plant was built. The building of these facilities is not, however, the action of which the defendants complain; rather, their statutory claim is based on the method of operating the water supply system each summer, which is a method that can be changed by the manner in which the City manages storage capacity and sequences the use of its various reservoirs. The facts negate the premise that the City asks this court to assume, that is, that the effect on the flow of the river was complete and immutable as soon as either the dam or the water treatment plant was built. In fact, the release of water from the Shepaug dam can be increased by relatively minor changes to the mechanism for releasing water to the river. The water treatment plant can continue to be used. Its operation is not dependent on restricting releases to the Shepaug River to 1.5 mgd in the summer months. If the City chose to continue not to use the Wigwam Reservoir, even after representing to the Department of Health in its water supply plan that this reservoir is an active reservoir with no water quality problems, the GKY Associates models show that it is practicable to satisfy the needs of the system's users without using the Wigwam Reservoir most of the time.
Under Connecticut law, where a party seeks equitable relief pursuant to a cause of action that would also allow that party to seek legal relief, concurrent legal and equitable jurisdiction exists, and the statute of limitation that would be applicable to bar the legal claim also applies to bar the equitable claim.Arrigoni v. Adorno, 129 Conn. 673, 681 (1943); Crittendon v.Brainard, 2 Root (Conn.) 485, 487 (1796); Dowling v. FinleyAssociates, Inc., 49 Conn. App. 330, 335 (1998); cert. granted,247 Conn. 907 (1998), reversed on other grounds, 248 Conn. 364
(1999).
Conn. Gen. Stat. § 22a-16, however, authorizes only equitable relief, not a suit at law for money damages. Where a CT Page 2138 party seeks equitable relief, that party is barred by the doctrine of laches if it has engaged in an inexcusable delay and if that delay prejudiced the party against whom injunctive relief is sought. Papcun v. Papcun, 181 Conn. 618, 620 (1980); Leary v.Stylarama of New Haven, Inc., 174 Conn. 217 (1978). Where, as in this case, the claimant alleges a continuing course of conduct, that is, the operation of the dam and tunnel in the summer months in a way that greatly reduces the flow below the natural flow, the court must determine whether the claimant sought relief within a time period that does not constitute an inexcusable delay from the events complained of. The defendants seek relief from the City's operations as carried out not in the distant past, but in the years immediately preceding the filing of suit, including the summers of 1997, 1996 and 1995. The court finds that there was no unreasonable delay in seeking relief from that continuing course of conduct.
The City has failed to prove any prejudice from the timing of the defendants' filing of their request for injunctive relief. The dam release mechanism is capable of alteration to increase the water storage capacity in the Cairns reservoir by raising the height of the spillway, thus preserving more water in high flow periods to allow greater releases in the summer. The water treatment plant can be used with a smaller diversion from the Shepaug, though more frequent use of power from sources other than the head pressure from the Pitch Reservoir may be necessary. The City presented no evidence to the effect that it had had an option of relocating the water treatment plant to a different location or that it forfeited some other advantageous plan that would have been available to it. Since the evidence establishes that the building of the water treatment plant in 1988 was necessitated by federal water quality requirements, the City has certainly not proven that it would not have built the plant if it had been aware of the defendants' claim sooner.
The court finds that the City has failed to prove the necessary elements of its defense of laches.
XII. Eligibility for relief
Having proven their claim under the CEPA, the defendants are entitled to relief, the scope of which is set forth below. The defendants have, in their counterclaim, further alleged entitlement to relief on the basis of breach of contract (Town of Washington only), violation of riparian rights, private nuisance CT Page 2139 and public nuisance. Each of these claims is asserted by the defendants in their counterclaims as a separate and sufficient basis for injunctive; relief therefore, the court will address each to determine whether each supplies an independent basis for granting the relief requested.
XIII. Breach of Contract
The City seeks a declaration that it has not breached the contract with the Town of Washington signed by the parties on May 3, 1921, and the Town of Washington alleges violations and seeks injunctive relief against further violations.
The conduct that Washington alleged to breach the contract is:
1) excess diversion of water
2) sales of water to towns other than those identified in the contract.
By stating in closing argument that it seeks no relief affecting the towns of Wolcott, Middlebury and Watertown, the Town of Washington has abandoned the second claim of breach, as well as any claim that sales to these towns were in excess of the actual needs of Waterbury's customers.
A. Excess Diversion
At paragraph 4 of the 1921 contract (Ex. 501), Waterbury agreed that "it will only divert such water to the extent that may be required to supply the actual needs of the customers of said city and to maintain the storage in its potable water supply reservoirs."
The City also agreed at paragraph 3 of the 1921 contract that it "will not divert water from the West Branch of the Shepaug River at any time when the distributing reservoirs into which the city aqueduct shall convey such water so diverted are full and overflowing."
Construed together, these provisions plainly indicate that Waterbury agreed to divert from the Shepaug only so much water as was necessary for the needs of customers, and not to draw from the Shepaug when it could satisfy those needs with water from the Wigwam watershed. Washington argues that the "distributing CT Page 2140 reservoirs" are clearly the Morris and the Wigwam Reservoirs, which were in use at the time the contract was entered into. The City purports to find the reference to be ambiguous and queries why the drafters would not have simply indicated these reservoirs by name. The City takes the position that "distributing reservoirs" refers to some smaller receptacles in the supply system at the time, not to the reservoirs themselves.
In determining contractual obligations in the face of ambiguous language, the courts must look to the contract as a whole and the circumstances existing at the time of execution. HansonDevelopment Co. v. East Great Plains Shopping Center, Inc.,195 Conn. 60, 65-66 (1985); Marsico v. Marsico, 195 Conn. 491, 493
(1985); White Oak Corporation v. State, 170 Conn. 434, 439
(1976); New Haven Sand Blast Co. v. Dreisbach, 102 Conn. 169, 180
(1925). "[T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words [and] language used must be accorded its common, natural, and ordinary meaning has usage where it can be sensibly applied to the subject matter of the contract." HLO Land Ownership Ass'n Ltd. v. City ofHartford, 248 Conn. 350 (1999).
The contract recites that it was entered into to avoid legislation, proposed by Washington, to preclude Waterbury from drawing water from the west branch of the Shepaug River. Washington sought enactment of the legislation out of fear that the City, which was highly industrialized and had a population that had been growing rapidly over the past forty years, would drain the river dry by unlimited diversions through the proposed tunnel. The terms reveal that the objective was to allow Waterbury only so much water as it actually needed from the Shepaug to supplement its existing supply in the Wigwam watershed, and to curb Waterbury's possible expansion of its system's needs by selling water to other towns. The prohibition on diverting water when the distributing reservoirs were full and overflowing similarly indicates the context of limiting diversions to need, that is, not using diversions from the Shepaug in a wasteful way or as a substitute for water from the Wigwam watershed.
Scrutiny of documents concerning the operation of the Waterbury water system around the time of the contract leads this court to conclude that at the time of the formation of the contract, the "distributing reservoirs into which the city aqueduct shall CT Page 2141 convey such water [that is, water diverted from the Shepaug River]" were the Morris and Wigwam Reservoirs. Most tellingly, on September 6, 1932, Attorney Arthur Shipman, of the law firm of Shipman Goodwin, wrote to T. Frank Hayes, the Mayor of Waterbury, on behalf of the Town of Washington concerning the City's diversion of water from the Shepaug River. Attorney Shipman cited the agreement not to divert from the Shepaug "at any time when the distributing reservoirs into which the city aqueduct shall convey such water so diverted are full and overflowing" and noted that he "dislike[d] Washington's going to the expense of constantly keeping watch upon the operations of the Shepaug Dam relative to the water levels in the Morris and Wigwam Reservoirs." The letter in reply contains no denial that the Morris and Wigwam Reservoirs are in fact the distributing reservoirs at issue in the cited contract term.
Examination of measurements of the elevation of the water level in the Morris and the Wigwam Reservoirs indicates that within the six-year statute of limitation period that applies to claims of breach of contract, the water level in either or both of these two reservoirs was frequently at the peak elevation, and therefore full and overflowing, on many days when the City was nevertheless diverting water from the Shepaug River through the tunnel aqueduct. This analysis requires examining, on Ex. 514, whether the Morris was at spillway height, 515.0 feet, and whether the Wigwam was at spillway height, 424.8 feet. The evidence establishes that the City released water from the Wigwam through a pipe. While the excess did not therefore overflow from the spillway, it overflowed from the pipe's discharge. In August 1996, for example, the Morris was at or over spillway level and thus full and overflowing, on eleven days on which the City nevertheless diverted 14.2 million gallons from the Shepaug River. In July 1996, the Morris was full and overflowing on fourteen days while the City drew 14.2 million gallons of water from the Shepaug River. In August 1994, the Morris was full and overflowing on all 31 days of the month while the City diverted 15 million gallons of water from the Shepaug River. In July 1993, the Morris was full and overflowing on fifteen days while the City diverted 25 million gallons of water from the Shepaug. On numerous days, both the Wigwam and the Morris were measured at or above spillway level, indicating that they were full and overflowing when water was being diverted from the Shepaug River.
Even if the 1921 contract were to be construed to allow diversion of water unless both the Wigwam and the Morris were CT Page 2142 full and overflowing, Washington has proven that such a condition occurred on multiple occasions. Other records, (Ex. 516) reveal that at least since July 1992, the City has not used water from the Wigwam Reservoir for the water supply, except for a few days in September 1999, just before the trial of this case began. The Wigwam Reservoir has the lowest location in the reservoir system. When water stored in it is not being sent to the water treatment plant for use to meet customer demand, the water that is diverted from the Shepaug River and allowed to flow into the Wigwam from the uphill Morris Reservoir is in excess of what is "required to supply the actual needs of the customers of said City and to maintain the storage in its potable water supply reservoirs" within the terms of the 1921 contract. Accordingly, between July 1992 and August 1999, the period covered by the record of use from each reservoir in Exhibit 516, days when only the Morris was overflowing were days on which the City was diverting more water from the Shepaug River than it needed for its actual needs, since water that spilled over to the Wigwam Reservoir was not used to meet the City's needs for water.
The City has represented in its water supply plan that its demand is 16.75 mgd. It has also calculated that the Wigwam watershed on its own has a safe yield of 13.0 mgd, (Ex. 62 p. III-17), indicating a disproportionate use of water from the Shepaug basin. Though the City has suggested that it operates its system in a way that excludes use of the Wigwam Reservoir because of concerns over quality, the records it submitted to the Department of Public Health indicate no findings of unacceptable water quality from required testing.[5]
The City has also suggested that use of greater diversions of water from the Shepaug to achieve goals such as reduction of energy costs does not violate the 1921 contract. The context of that contract defeats this construction: the "actual needs of the customers" referred to in the contract can only be logically construed to mean their needs for water, not their "needs" fifty years later to save money on power requirements of the system. Diversion of water to supply power likewise cannot be characterized as being required for the other authorized use: "to maintain the storage in its potable supply reservoirs." The water used to power the turbines is in fact often not stored at all, but ultimately released by overflows from the reservoirs.
The Court finds that within the six years preceding the institution of this action, the City breached the May 3, 1921 CT Page 2143 agreement in the ways discussed above. Though the City has claimed laches, it has not proven any prejudice from Washington's failure to file suit sooner. It is able to adjust, the operation of its water supply system on an ongoing basis. The court adopts in this context the discussion of laches set forth above in connection with the plaintiffs' statutory claim.
The only remedy that Washington seeks for what the court has found to be a repeated violation of the 1921 contract is an order of specific performance of the terms of the contract. The court has incorporated into the orders set forth below appropriate relief in favor of the Town of Washington as to this claim.
XIII. Riparian Rights
The Towns of Washington and Roxbury and the Steep Rock Association, Inc. and the Roxbury Land Trust Inc., make the additional claim in their counterclaim that their riparian rights in the flow of the river have been infringed by the City's diversion of the flow of the west branch of the Shepaug River. Each of these parties owns land abutting the Shepaug River below the Shepaug dam.
Because the City stated in its complaint that it seeks a declaratory judgment that it has not infringed upon the riparian rights of landowners along the Shepaug River, the court ordered service on every riparian owner against whom the City sought judgment. In its trial brief, at page 68 n. 13, the City makes it clear that it did not pursue its claim for declaratory relief against any riparian owner except the four listed above. The court will consider the claims concerning riparian rights only with regard to these four parties, who are riparian owners by virtue of owning land that abuts the Shepaug watercourse.
It is well established that persons who own land abutting a river are riparian owners "entitled to the natural flow of the water of the running stream through or along their land, in its accustomed channel, undiminished in quantity or unimpaired in quality." Collens. v. New Canaan Water Co., 155 Conn. 477, 486
(1967); Adams v. Greenwich Water Co., 138 Conn. 205, 217 (1951).
Contrary to the City's assertion in oral argument, made without regard to contrary holdings in cases cited in its own brief filed with this court, there is no requirement that a riparian owner prove that he was using the water flow in some way in order to be CT Page 2144 entitled to protection of his riparian rights. The plaintiffs inCollens v. New Canaan Water Co., supra, 155 Conn. 477, were homeowners, and no finding was made that they were actually using the river's flow in any way. In Dimmock v. New London,157 Conn. 9, 14 (1968), the Supreme Court, reiterating the principles announced in Parker v. Griswold, 17 Conn. 288 (1845), stated that the right recognized in Collens and other cases "is an ancient common-law right which a riparian owner can protect without reference to any beneficial use of the water actually made by him."
 As this court said over one hundred years ago: "Whatever doubt may have been entertained formerly upon this subject, it is now settled, by the uniform course of decisions, both in England and in this country, that where one has a right to the use of a stream naturally flowing through his land, capable of being used for a beneficial purpose, and it is diverted therefrom by another, it is not necessary for the person having such right, in an action for such diversion, to prove, that he has actually applied the water running through his land for any beneficial purpose; or, in other words, that he sustained any specific damage by such diversion, interfering with his application of the water; but that he has a right to recover, notwithstanding he has sustained no perceptible or actual damage by such diversion."
Dimmock v. New London, supra, 157 Conn. 15.
Where the party diverting or diminishing the stream is a public water utility and where the diversion is shown to be necessary for the public health and welfare, a court may exercise its discretion to deny injunctive relief, as occurred in Dimmock v.New London, supra, 157 Conn. 9, and award only monetary relief, if damages have been proven.
Under well-established principles of the law of riparian rights along rivers, the four defendants are entitled to relief unless the City has proven its special defenses or otherwise negated their claims.
The Town of Washington, which owns land along the Shepaug River entered into the May 3, 1921 contract discussed above that, by its terms, authorized the City to diminish the flow of the river to a particular degree and in stated circumstances. The City characterizes this contract as a total relinquishment of all of the riparian rights of the Town of Washington as a landowner. No such construction is warranted. By the terms of the 1921 CT Page 2145 contract, the Town agreed to relinquish its riparian right to the natural flow of the river only when the City's distributing reservoirs were not full and overflowing and only to the extent necessary to meet the water needs and water storage needs of the City's customers. A diminishment of the flow under other conditions or for other reasons would constitute a violation of the Town's retained riparian rights.
The City takes the position that the Town of Washington waived not only its own riparian rights as a landowner but also the riparian rights of any residents of the town with riparian rights along the Shepaug River. The City cites no legal support for the extraordinary proposition that a Town may barter away the rights of property owners within the town, with no record of the Town having gained ownership of those rights by eminent domain, the manner recognized by the Supreme Court in Dimmock v. New London,
supra, 157 Conn. 20, as the appropriate means for a town to acquire the right to exercise control over a landowner's right in the stream flow.
The City's more substantial defense of this claim is the position that it has acquired a prescriptive right to divert or diminish the stream in the manner that it has done. Riparian rights, like other property rights, may be lost to prescriptive use. Dimmock v. New London, supra, 157 Conn. 15, citing Conn. Gen. Stat. § 47-37 ("No person may acquire a right-of-way or any other easement from, in, upon or over the land of another, by the adverse use or enjoyment thereof, unless the use has been continued uninterrupted for fifteen years"); and Stamford ExtractMfg. Co. v. Stamford Rolling Mills, Co., 101 Conn. 310, 321
(1924); S. O. C. Co. v. Ansonia Water Co., 83 Conn. 611, 624
(1910).
In order to acquire the riparian rights of a landowner by prescription, Waterbury must prove that its use is adverse to the owners right, has been open, visible, continuous and uninterrupted for fifteen years, and has been made under a claim of right. Westchester v. Greenwich, 227 Conn. 495, 501 (1993), citing Whiting v. Gaylord, 66 Conn. 337, 344 (1895); Andrzejczykv. Advo System, Inc., 146 Conn. 428, 431 (1959). "A use by express or implied permission or license cannot ripen into an easement by prescription." Westchester v. Greenwich, supra,227 Conn. 501; Sachs v. Toquet, 121 Conn. 60, 66 (1936); Klar CrestRealty, Inc. v. Rajon Realty Corporation, 190 Conn. 163 (1983). CT Page 2146
The impairment of the riparian rights of the Town of Washington cannot be held to proceed from a prescriptive right because the May 3, 1921, contract is the source of permission to alter the flow to which the Town of Washington had a right as a riparian owner. Additionally, neither as to the Town of Washington nor as to any of the other three riparian owners has the City proved that its adverse conduct has been open and visible. The presence of the Shepaug dam has certainly been an open and visible barrier on the river since 1933. The operation of that dam is not, however, open and visible as a cause of low flow in the river. At some times of the year, the City diverts no water from the Shepaug River by way of the dam and aqueduct. The flow of the river is subject to natural changes caused by rain and runoff. The City's diversion of the flow takes place through the operation of controls in the dam face, on property owned by the City to which access is restricted.
If the existence of the May 3, 1921, contract were seen as making the diversion of water "open and visible," that document would alert a riparian owner only to diversions that conformed to the limitations in that contract. Diversion of water in excess of the City's customers' needs or at times when the distributing reservoirs were full and overflowing would not be open and visible to riparian owners along the Shepaug. Diversions made to the extent authorized by the 1921 agreement would not be adverse because the City engaged in them under the terms of a contract that recognized the rights of others.
The court finds that the Town of Washington has contractually ceded its riparian rights only to the extent stated in the 1921 contract, and that the City has not acquired Washington's riparian rights or the riparian rights of the Town of Roxbury, the Roxbury Land Trust, Inc., or the Steep Rock Association, Inc. None of the parties has proven any actual damages that would entitle them to a monetary award. While the Town of Washington, having ceded some of its riparian rights by contract, is entitled to injunctive relief only against diversions that impair its riparian rights in excess of the extent agreed to in that contract, the other riparian owners are entitled to injunctive relief from the City's violation of their riparian rights that is the same as the relief awarded pursuant to this court's finding of a violation of the CEPA.
As was the case in Dimmock v. New London, supra, 157 Conn. 9, the diversion that infringes the defendants' riparian rights is CT Page 2147 occasioned in part by the needs of a public water supply. The court therefore exercises its discretion to curb that diversion only to the extent that it has been found to violate the CEPA. The needs of the City's water supply system counsel against greater relief for violation of riparian rights.
XIV. Nuisance
The defendants further claim that the City's diversion of water constitutes both a private and public nuisance.
A. Private Nuisance
In order to prove a claim of private nuisance, a claimant must show 1) that the condition complained of had a natural tendency to create danger and inflict injury upon person or property; 2) the danger created was a continuing one; 3) the use of the land was unreasonable or unlawful; and 4) the existence of the nuisance was the proximate cause of the plaintiff's injuries and damages. Elliott v. Waterbury, 245 Conn. 385, 420 (1998); Keeneyv. Old Saybrook, 237 Conn. 135, 162-63 (1996); Tomasso Bros.,Inc. v. October Twenty-Four, Inc., 221 Conn. 194, 197 (1992);State v. Tippetts-Abbett-McCarthy-Stratton, 204 Conn. 177, 183
(1987); Filisko v. Bridgeport Hydraulic Co., 176 Conn. 33, 35-36
(1978). A cause of action for private nuisance requires proof of injury to "a right which [the, claimant] enjoys by reason of ownership of an interest in land." Elliott v. Waterbury, supra,245 Conn. 421; Webel v. Yale University, 125 Conn. 515, 525
(1939).
Liability in nuisance can be imposed on a municipality only if the condition constituting the nuisance was created by the positive act of the municipality. Elliott v. Waterbury, supra,245 Conn. 421; Keeney v. Old Saybrook, supra, 237 Conn. 165-66;Prifty v. Waterbury, 133 Conn. 654, 657 (1947). The diminishment of the flow of the Shepaug River is the result of the positive act of the City in intentionally diverting water from the Shepaug watershed through the tunnel aqueduct.
In count three of their counterclaim, in which they allege private nuisance, the defendants allege that the danger created by the City's reduction of the river's flow is that the inadequate flow of the Shepaug River may threaten the safety of adjoining landowners and their families living along the river by rendering the flow insufficient for use in combating fires. CT Page 2148 Though a member of the Washington fire department testified that the river is used in addition to tank trucks to extinguish fires, he testified that the river had never been too low to supply water for any fire within his twenty-five years as a firefighter.
The danger of harm on which the claimants base their nuisance claim is not a claim that their properties or those in residence will suffer harm caused by the flow of the river, but rather that the flow of the river may be too low to protect them from harm caused not by the City but by other causes, that is, fires. The property owners presented no evidence to support a conclusion that water at the flow rates at issue actually causes a greater incidence of fires along a river.
In their brief, the counterclaimants make no mention of any claim of danger or harm to their property resulting from the direct actions of the City, rather they argue that "Waterbury's diversions have a natural tendency to create danger and inflict injury upon the Shepaug River and its aquatic life." (Emphasis supplied.) (Defendants' Brief, p. 52). The counterclaimants do not own the river or its aquatic life, and cannot prevail on a theory of private nuisance for interests that are not their interests as property owners.
This court concludes that the counterclaimants have failed to prove the creation of a dangerous condition or injury to their land from the manipulation of the flow of the river by Waterbury.
B. Public Nuisance
To make a prima facie case of public nuisance, a claimant must show, inter alia, that the conduct claimed to constitute a nuisance interferes with a right common to the general public, has "a natural tendency to create danger and inflict injury upon person or property" and proximately caused such an injury. Doe v.Manheimer, 212 Conn. 748, 756 n. 4 (1989); Higgins v. ConnecticutLight Power Co., 129 Conn. 606, 611 (1943). None of the counterclaimants proved that the low flow of the river had resulted in danger that caused it to suffer an injury to person or property in the exercise of a right enjoyed by the public in general.
Though the public trust in the river as a natural resource has been unreasonably impaired in violation of the CEPA, as is discussed above, the diversions do not also create a dangerous CT Page 2149 condition productive of injury, the harm that is, by contrast, protected by the common law prohibiting public nuisances.
XV. Claims by the Towns of Wolcott, Watertown and Middlebury
As has been explained above, in closing argument the counterclaimants abandoned any claim for relief based on sales of water to adjoining towns that are already the subject of contracts and that are set forth in the City's current water supply plan. The court has left to determination by the Department of Environmental Protection, subject to the continuing jurisdiction of the court, the pending applications by Middlebury and Waterbury and by Wolcott and Waterbury, for additional diversions to supply these towns with additional water in the case of Wolcott and a supply of water, in the case of Middlebury. Existing contracts with towns and other municipal entities, and their use of water as customers of the City's water supply, are given effect by the court in the analysis of the various claims by including the consumption by these users in the consideration of demand and in the related consideration of the existence of feasible and prudent alternatives for water supplies for all of the City's existing customers, including municipal customers. For this reason, no further discussion of the claims of these parties is necessary.
XVI. Conclusion
The use of some volume of water from the Shepaug River is necessary to meet the needs for water of the customers of the Waterbury Water Bureau, including those towns whose needs are already reflected in the City's current water supply plan. The City's diversion of water from the west branch of the Shepaug River is, however, subject to the requirements and prohibitions of the Connecticut Environmental Protection Act, which protects the public trust in natural resources against "unreasonable impairment" where there is a feasible and prudent alternative to such impairment.
This court has found that the counterclaimants have proved that in the summer months the manner in which the City operates its tunnel diversion and the limitations that its chosen method of operations impose on the flow of water down the Shepaug River constitute an unreasonable impairment of the public trust in this natural resource, substantially impairing the natural flow of the river. Fortunately, the City has feasible and prudent CT Page 2150 alternatives available to it that will enable it to continue to maintain an ample water supply without imposing unreasonable impairments on the public trust in the Shepaug River. It has been demonstrated that by altering the pattern of its storage in the various reservoirs, by imposing long-neglected, nonburdensome conservation measures, and by relatively small changes in its equipment, the City can continue to meet its water needs. These changes can be achieved at reasonable cost.
The relief ordered below reflects these findings, which are stated in the body of this opinion in detail. The same relief is ordered to redress what the court has found to be the City's breach of certain provisions of its 1921 contract with the Town of Washington concerning limits on diversions of water from the Shepaug River, and also to provide a remedy for the impairment of the riparian rights of the Towns of Washington and Roxbury, the Steep Rock Association, Inc. and the Roxbury Land Trust, Inc.
An important element in achieving finality to this long and sometimes acrimonious dispute is to provide relief that permits all parties to be assured that a change in operations takes place promptly and remains in force. For that reason, the relief includes the requirement that a stream gauge be obtained and operated to allow verification of the river's flow, so that the relationships between and among these Connecticut neighbors will not be further marred by distrust or by disregard of each other's interests in a resource that has many kinds of value for the various parties.
On the claims of nuisance, this court finds in favor of the City and declares that the conditions at issue in this case have not been proven to constitute either a private or a public nuisance. The court enters the following injunctive relief:
1. The City of Waterbury, its agents, servants and employees, are hereby permanently enjoined from operating the City's water supply system and from diverting water from the west branch of the Shepaug River through the aqueduct tunnel in a manner that results in a daily flow at Peter's Weir or other suitable location for a stream gauge above the confluence with the Bantam River of less than the following stream flow in the indicated months:
May: 34.3 mgd CT Page 2151
June: 13.8 mgd
July: 7.6 mgd
August: 6.5 mgd
September: 6.1 mgd
October: 9.8 mgd
2. Between the date of this order and the completion of alterations necessary to produce the flow rates specified above, the City shall operate the existing eight-inch discharge pipe from the Shepaug Dam at a maximum rate of discharge. Alterations to achieve the flow required at paragraph 1 shall be commenced expeditiously and shall be completed by May 1, 2002.
3. The releases required by paragraphs 1 and/or 2 above may be reduced or suspended in the event of a declaration of a water supply emergency pursuant to Conn. Gen. Stat. § 22a-378 or § 25-32b, only to the extent necessary to comply with any conditions imposed under the declaration issued under such statutory provisions.
4. The City of Waterbury may temporarily reduce the releases required by paragraphs 1 and/or 2 above for the purpose and only during the time actually necessary to make safety repairs or modifications approved by the Commissioner of Environmental Protection, including the modifications necessary to achieve the releases ordered above. Such reductions shall not be greater than is necessary to complete such projects.
5. The City of Waterbury shall not divert water from the Shepaug watershed at any time when the Pitch Reservoir and also either the Morris Reservoir or the Wigwam Reservoir is full and either overflowing or discharging water through a pipe or by other means other than discharge to the water treatment plant of water to be supplied to customers for their water consumption needs.
6. The City of Waterbury shall file the following with the appropriate regulatory authorities within ninety (90) days of the issuance of this order:
 A. All applications necessary to alter the Shepaug dam and other CT Page 2152 structures to achieve the release rates and comply with the other orders set forth above;
 B. An application to revise its water supply plan to reflect revised methods of operation and revised drought triggers and other changes necessary to comply with the release rates and other orders set forth above.
The City of Waterbury shall immediately upon filing supply each defendant with a copy of each application filed.
7. The City of Waterbury shall make its best efforts to contract with the United States Geological Survey to install and monitor a stream gauge at a location at or downstream from Peter's Weir and upstream from the confluence of the Shepaug River with the Bantam River. If no such stream gauge has been installed by March 1, 2001, any of the defendants may arrange for the installation of such a stream gauge, and the City of Waterbury shall pay the costs associated with such installation and of monitoring of the gauge. Such stream gauge shall be of a kind sufficient to determine on an ongoing basis whether the flow of the Shepaug River is in compliance with the foregoing orders.
This court makes no order with regard to the interests of the Towns of Wolcott, Middlebury and Watertown, for the reasons set forth above. The pending applications to alter the diversion permit of the City to permit increased water sales to Wolcott and Middlebury shall be adjudicated by the Department of Environmental Protection, and this court retains jurisdiction pursuant to Conn. Gen. Stat. § 22a-18.
The City of Waterbury has prevailed on its claim that its conduct does not constitute a public or private nuisance; and the court hereby enters a judgment in favor of the City on these claims only, declaring that the City of Waterbury has not created a condition that is a private or public nuisance with regard to the Towns of Washington and Roxbury, the Steep Rock Association, Inc., the Roxbury Land Trust, and the Shepaug River Association, Inc. The City is not entitled to any of the further declaratory or other relief sought in its complaint.
The parties stipulated at trial that any application for costs and attorney's fees pursuant to Conn. Gen. Stat. § 22a-18 (e) would be adjudicated in a separate proceeding. Any application for such an award shall be filed with the court within thirty CT Page 2153 days of the date of this ruling.
Beverly J. Hodgson Judge of the Superior Court